(No. 72074.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT CLOUTIER, Appellant.

*Opinion filed October 21, 1993.*

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence M. Madsen, Assistant Attorney General, of Chicago, and Renee G. Goldfarb and Margaret J. Faustmann, Assistant State's Attorneys, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Robert Cloutier, was found guilty of the aggravated criminal sexual assault (720 ILCS 5/12—14(a)(4) (West 1992)) and murder (720 ILCS 5/9—1(a) (West 1992)) of Alice Cogler. At a separate sentencing hearing, the same jury found defendant eligible for the death penalty on the ground that the murder had been committed in the course of the felony of aggravated criminal sexual assault. (720 ILCS 5/9—1(b)(6)(c) (West 1992).) Finding no mitigating circumstances sufficient to preclude the imposition of the death penalty (720 ILCS 5/9—1(g) (West 1992)), defendant was accordingly sentenced to death. Defendant's sentence of death has been stayed pending direct appeal to this court. Ill. Const. 1970, art. VI, §4(b); 720 ILCS 5/9—1(i) (West 1992); 134 Ill. 2d Rules 603, 609(a).

Defendant raises numerous challenges on appeal, which can be broadly divided into errors concerning jury

selection, errors occurring during the guilt phase of his trial, errors that occurred at his sentencing hearing, and, finally, constitutional challenges to the Illinois death penalty statute. Defendant's specific allegations will be discussed more fully as we consider each alleged error.

The victim, Alice Cogler, was 4 feet 8 inches tall and weighed 86 pounds. She worked in the afternoon and early evening of January 27, 1990, as a bartender at a neighborhood bar in the Chicago neighborhood of "Clearing." She remained after the end of her shift at 6 p.m. until the bar closed at 3 a.m. At that time, only the manager, the manager's spouse, the victim, and defendant remained on the premises. Defendant had frequented the bar daily for the prior month, had become friends with the manager and casually knew the victim by her first name. After the victim told the manager that she was giving defendant a ride home, the manager saw the victim leave with defendant in a two-door, brown Oldsmobile, which actually belonged to the victim's fiance. However, the victim had used the car exclusively for the prior three years, and the interior had been spotless and undamaged only two days before when last seen by her fiance.

An acquaintance, Jeffrey Sesak, saw defendant later at 4:30 a.m. at another neighborhood bar and introduced defendant to Susan Bradford. Together with a group of people including Sesak and Bradford, defendant again remained at that bar until it, too, closed. At that time, defendant left with the group to continue the party at Sesak's home. Sesak's girlfriend sat in the front seat of the brown Oldsmobile, which defendant was driving. When Sesak attempted to get in the back seat, defendant stopped him with the explanation that a friend, whose head Sesak saw sticking out from beneath a coat, was sleeping in the back seat. Thus, Sesak sat in front with his girlfriend and defendant. At that time, Sesak

noticed that the headliner and driver's side visor of the car were torn. After stopping at a liquor store, Bradford started to place a 12-pack of beer in the back seat of the victim's car, but was stopped by defendant. Defendant explained that he did not have a driver's license and did not, therefore, want the liquor in the car. On arriving at Sesak's home, Sesak suggested defendant's sleeping friend also come inside to "sleep it off," but defendant declined, saying his friend could sleep in the car.

When the gathering at Sesak's broke up, defendant offered Bradford a ride home. After initially heading in the direction of Bradford's home as directed, defendant instead pulled into an alley, saying he had to urinate. However, he locked the passenger door with one hand while at the same time covering Bradford's mouth with his other hand. Defendant told Bradford to do as he asked and that he did not want to hurt her. Defendant then pulled Bradford's hair and turned her to face the back seat, where defendant uncovered the dead body of the victim. Defendant threatened Bradford that she would face a similar fate if she did not do as defendant asked. Defendant then kissed Bradford and began fondling her. Bradford removed her coat, shirt, and shoes, but told defendant her necklace was caught on her shirt to stall for time. As defendant began to untangle her necklace, Bradford jumped out of the car, and defendant tried unsuccessfully to pull her back into the car by her hair. Following Bradford out of the car, defendant punched, kicked, and choked her. Defendant left Bradford in the alley dressed only in her bra and slacks when something apparently startled him, but threatened to find and kill Bradford as he left.

At 7 a.m. the same day, defendant encountered Elizabeth Halili at the gas station where she worked as she began to open the station for business. After helping Halili retrieve equipment used to measure the gas levels,

defendant came into the station to buy a can of soda. As Halili began to make change, he grabbed her and took the cash from the register, and defendant then abducted Halili in the brown Oldsmobile. Defendant again drove to an alley. When Halili refused to undress as directed, defendant ripped her blouse and began choking her when she tried to open the passenger door of the car, which was locked and from which the lock post had been removed. Defendant then showed Halili the victim's body in the back seat of the car and again threatened that she would end up like the naked dead woman if she did not do as he said. Halili removed her shoes and slacks, and then another struggle ensued during which defendant ripped Halili's panties off and hit Halili in the face repeatedly. Although very petite, Halili eventually scratched defendant, kicked him in the groin, and made a lunge for the open driver's door and escaped. Defendant then drove off and left Halili wearing only her torn blouse with a tank top underneath.

Marie Goodman testified to a fourth similar incident a short time later the same day. In contrast to the other women, however, Goodman had known defendant since the prior fall, having met him under a different name at the bar where she worked. At that time, defendant had without invitation joined a group of people Goodman invited to her home after the bar closed. Prior to January 1990, defendant had arrived unannounced at Goodman's home several times to ask her out. In the eight days immediately preceding January 28, 1990, defendant had made daily such appearances, which Goodman persisted in declining.

At approximately 7:30 a.m., defendant appeared at Goodman's apartment and asked her to have a friend watch her three-year-old son so she could accompany him to breakfast. When she again refused, defendant asked to wash up because of a fight he had been in, to

which Goodman acquiesced. Defendant returned between 10 and 10:30 a.m., at which time he again asked Goodman to have a friend watch her son, but eventually both Goodman and her son accompanied him to breakfast. As they returned, defendant tucked his hair in his jacket and placed Goodman's son on his shoulders as they approached several police cars. Goodman's son remained outside to play, but defendant returned to her apartment to use the washroom. Once inside, defendant grabbed Goodman by the throat, pulled her down onto a mattress, ripped her shirt off, choked her, and forced her to touch his genitals. Defendant fled when Goodman's son returned.

Defendant was arrested on February 1, 1993, based on a police bulletin identifying him as the perpetrator in the Bradford and Halili incidents and as a suspect in the case of the missing victim and another woman. Although defendant had car keys in his pocket, he was on foot when arrested. When asked why, defendant told police that the keys included in the inventory of his property belonged to the other missing woman, Cynthia Cooney, whom defendant admitted killing in the early morning hours of January 29, 1990, and whose body he had dumped in the Des Plaines River. Defendant told police where Cooney's car was located, and her torn panties were recovered from under the front seat of the car. Two newspapers, dated January 31, 1990, and February 1, 1990, were also found in the car. Cooney's slight 5 foot 3 inch body, wearing only part of her black camisole and shirt, was recovered from the river. A white bra had been stuffed in her mouth and down her throat. Cooney's jeans, on which with the teeth of the zipper had been broken, leggings with a similarly damaged zipper, and the other half of her torn black camisole were recovered from a girder beneath the bridge on the Des Plaines River near where her body was found.

Defendant also admitted killing the victim and revealed the location of the brown Oldsmobile, from the trunk of which the victim's body was recovered. The victim was lying spread-eagle and wearing only her watch and socks. A fan belt was wrapped around her neck. The victim's sweater and boots were recovered from inside the car, but her panties and slacks were not found. Nor was the missing clothing of Halili and Bradford found in the brown Oldsmobile. A pillow, which the victim had used to see above the steering wheel when driving, was also recovered. A used tampon was recovered from the floor of the back seat together with some beer cans. There was blood on the victim's face, abrasions on her knees and one arm, and bruises on her neck and face. In addition, there was blood and fecal matter on her buttocks and vaginal area.

Defendant gave police officers a narrative account, which was repeated later for a court reporter, of the killing of the victim. Defendant told police that he left the bar with the victim earlier in the evening for an hour, during which they drove to a deserted area and she performed fellatio on him. When the bar closed, they again left together in the victim's car and this time engaged in both consensual vaginal and anal intercourse in the front seat. They then moved to the rear seat, where they again had consensual vaginal intercourse. As defendant lay on top of the victim in the back seat with her arms around him, a thought told him to kill her, and he strangled her with his hands. Defendant then placed his ear on her chest and, hearing a heartbeat, picked up the fan belt from the rear floor of the car and strangled the victim with the fan belt until her lips turned blue. Defendant stated that the victim did not struggle much during the attack. After killing the victim, defendant covered her body with his coat and the pillow.

Defendant made a similar statement with regard to his killing of Cooney. Defendant met Cooney in a neighborhood bar on the same day he killed the victim and attacked Bradford, Halili, and Goodman. They left together in Cooney's car shortly after midnight. Defendant told police that, as with the victim, he and Cooney engaged in consensual intercourse in both the front and back seat of her car, after which a thought came to him to kill her. As he lay on top of her with her arms around his back, defendant strangled Cooney with his hands. Defendant also repeated this statement for a court reporter. Further facts relevant to the proceedings will be discussed as we address each of the issues raised by defendant.

## JURY SELECTION ISSUES

Defendant's allegations of error concerning the selection of the jury are: (1) the court's refusal to conduct individual, sequestered *voir dire* was an abuse of discretion based on the exposure of the venire to one prospective juror's negative opinion of psychiatric testimony in response to questioning; (2) the trial court erred in refusing to "reverse-*Witherspoon*," or "life-qualify," the jury; and (3) the trial court abused its discretion in excusing another prospective juror for cause based on her responses to *Witherspoon* questioning.

Defendant presented an insanity defense through the expert testimony of a psychiatrist. Prior to jury selection, defendant requested individual, sequestered *voir dire* because of the possibility of exposure to others' biases and prejudices against psychiatrists or the insanity defense during *voir dire en masse*. The court denied defendant's request and *voir dire* was conducted in open court. Defendant also submitted two alternative *Witherspoon* questions concerning the jury venire's attitudes towards the death penalty. First, defense counsel re-

quested that the venire be asked a *Witherspoon* question of "[i]f you convicted someone of murder, are there circumstances under which you could consider giving the death penalty?" The second question tendered asked "[o]n the other hand, if you convicted someone of murder, would you be able to consider a sentence less than death for that person?" Those questions were refused, the trial court specifically referring to such questions as reverse-*Witherspooning* and the State specifically arguing that "life-qualifying" questions were not required.

Defendant first asserts that the trial court abused its discretion in refusing to conduct individual, sequestered *voir dire*. Specifically, defendant points to the responses of one prospective juror, who was later excused for cause, who responded "A little" to defense counsel's question whether prior experience with psychiatrists or psychologists "set [him] off one way or another?" The prospective juror further responded "yes" when asked if his opinion was sort of negative and "maybe" when asked if he would give less weight to the testimony of a witness as a result of membership in such professions. He responded "I think so" when asked if he would disregard such expert opinions. As the defense counsel began to move on to question another, the prospective juror volunteered that he had not been asked whether he had any notions about anybody who might be a heavy drinker or take illicit drugs, as had prior venire members, and that he had very strong feelings that such conduct was a "cop out," and that he had experience with "people like that." Defendant argues that the excused prospective juror's comments thus "polluted" the venire.

This court specifically rejected an identical argument in *People v. Seuffer* (1991), 144 Ill. 2d 482. The conduct and scope of *voir dire* is within the discretion of the trial court. (134 Ill. 2d Rules 431, 234; *People v. Howard* (1991), 147 Ill. 2d 103, 134.) The purpose of *voir dire* is

to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath. (*Seuffer*, 144 Ill. 2d at 500, 505; *Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852.) Although a trial court may in the exercise of its discretion allow sequestered *voir dire* (134 Ill. 2d Rules 431, 234; *People v. Neal* (1985), 111 Ill. 2d 180, 197-98; *People v. Newbury* (1972), 53 Ill. 2d 228, 241), only when the court's actions have frustrated the purpose of *voir dire* will an abuse of discretion be found (*Howard*, 147 Ill. 2d at 133; *Seuffer*, 144 Ill. 2d at 500, see also *Kingston v. Turner* (1987), 115 Ill. 2d 445, 465-67). *Voir dire* cannot, however, be used as an opportunity to even slightly indoctrinate a juror. See *People v. Morgan* (1986), 112 Ill. 2d 111, 129.

Defendant asks us to reconsider *Seuffer*, urging that prejudice against the insanity defense requires individual, sequestered *voir dire*. We have recognized that laymen may view an insanity defense with some suspicion. (*People v. Bowel* (1986), 111 Ill. 2d 58, 65.) It is for that reason that a prospective juror's views on the insanity defense are an appropriate area of inquiry on *voir dire*. (*People v. Stack* (1986), 112 Ill. 2d 301, 313.) However, defendant does not challenge the adequacy of such inquiry in this instance and his citation to *Turner v. Murray* (1986), 476 U.S. 28, 90 L. Ed. 2d 27, 106 S. Ct. 1683, which was based on complete failure to inquire, is inapposite.

Defendant argues that *Seuffer*'s requirement that a defendant show that a biased and prejudiced juror actually sat as a result of *voir dire en masse* is impossible to meet. Mere suspicion of bias, however, is not sufficient to disqualify a juror for cause. (*People v. Collins* (1985),

106 Ill. 2d 237, 274.) If proper *voir dire* questions have been posed and responses revealing no bias have been received, both of which admittedly occurred here, there is no basis other than mere suspicion on which to challenge the impartiality of the jurors. Thus, we decline to presume that mere exposure to another's bias tainted the venire, each member of which expressly denied any such similar bias. Rather, we assume that the jurors were reasonable, conscientious, and impartial and able to apply the standards applicable in this instance. See *Strickland v. Washington* (1984), 466 U.S. 668, 695, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068; *Collins*, 106 Ill. 2d at 274-75.

Defendant next asserts that the trial court erred in refusing to reverse-*Witherspoon* the prospective jurors. A prospective juror cannot be excused for cause solely because of opposition to the death penalty (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 522 n.21, 20 L. Ed. 2d 776, 785 n.21, 88 S. Ct. 1770, 1777 n.21; *Lockhart v. McCree* (1986), 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50, 106 S. Ct. 1758, 1766; *Seuffer*, 144 Ill. 2d 482), but such juror may be so excused if her opposition is such that it would prevent or substantially impair the performance of her duties as a juror in accordance with her instructions and oath (*Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526; *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52, 105 S. Ct. at 852). At the time of defendant's trial, no reverse-*Witherspoon* questioning was required in Illinois, and the trial court was not required to pose defendant's tendered questions. See, *e.g., People v. Morgan* (1991), 142 Ill. 2d 410, 469, *reversed* (1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222; *People v. Brisbon* (1985), 106 Ill. 2d 342, 359.

However, while defendant's appeal was pending, the United States Supreme Court decided *Morgan v. Illinois*

(1992), 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222, and specifically addressed the issue of reverse-*Witherspoon* questioning. The *Morgan* Court held that a defendant is entitled to inquire into prospective jurors' opinions in support of the death penalty, or reverse-*Witherspoon* a jury, to the same extent that the State is entitled to elicit information about prospective jurors' opposition to the death penalty, or "death-qualify" a jury. (*Morgan*, 504 U.S. at 735-36, 119 L. Ed. 2d at 506-07, 112 S. Ct. at 2233.) Based on *Morgan*, defendant asserts his death sentence must be reversed and his cause remanded for a new sentencing hearing by a jury properly subjected to both *Witherspoon* and reverse-*Witherspoon* inquiry. See *People v. Morgan*, 112 Ill. 2d at 138 (*Witherspoon* error applies only to sentencing and does not affect conviction); *Griffith v. Kentucky* (1987), 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 ("new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final").

The State, however, directs our attention to the second of the two questions tendered and responds that it was not a reverse-*Witherspoon* question. Therefore, the State argues that the trial court was not required to pose such question.

The State's assertion is technically correct. In asking whether a prospective juror would "consider a sentence less than death," defendant's proposed reverse-*Witherspoon* question misstated the law because the judge, not the jury, determines a defendant's noncapital sentence. Once convicted of an offense for which the death penalty is available, it is an inescapable conclusion that a defendant will in fact be sentenced either to death based on the direction contained in the jury's verdict or otherwise. The practical effect of a jury's decision not to impose the death penalty is, therefore, that a defendant will receive

"a sentence less than death." That the court actually imposes such sentence does not diminish the jury's role in the determination of which type of sentence will be imposed. (*People v. Fields* (1990), 135 Ill. 2d 18, 57.) In practice, therefore, the State's technical assertion is meritless.

In addition, the State's reliance on such narrow reading of defendant's proposed questions ignores the ultimate purpose of *voir dire*, which is to secure an impartial jury through insightful questioning designed to reveal prejudice. (*Seuffer*, 144 Ill. 2d at 500.) There is no precise catechism or formula of questions that can precisely identify those prospective jurors whose opposition to the death penalty will prevent them from fulfilling their duties as jurors. (*Morgan v. Illinois*, 504 U.S. at 729-30, 119 L. Ed. 2d at 503, 112 S. Ct. at 2230; *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 385-86; *People v. Stewart* (1984), 104 Ill. 2d 463, 486; *People v. Gaines* (1981), 88 Ill. 2d 342, 356.) Questions designed to reveal an overwhelming bias in favor of imposition of the death penalty such that a juror is rendered unable to impartially apply the law as instructed are no less difficult to draft with precision, and reverse-*Witherspoon* questions worded similarly to those propounded here have been given in jurisdictions where reverse-*Witherspoon* questioning has been required. (See *Patterson v. Commonwealth* (1981), 222 Va. 653, 657-60, 283 S.E.2d 212, 214-16 ("would you be able to consider voting for a sentence less than death?"); *Skipper v. State* (1988), 257 Ga. 802, 806, 364 S.E.2d 835, 839 ("capable of considering penalties other than death"); *State v. Rogers* (1986), 316 N.C. 203, 218, 341 S.E.2d 713, 722 ("conceive of a circumstance where she would impose a life sentence rather than the death penalty").) Thus, defendant's tendered questions were adequately framed to elicit the prospective jurors' possible bias in favor of the death penalty.

Finally, we reject the State's contention because the trial court and the State both not only considered defendant's second proposed questions in context of the first, but expressly described them as reverse-*Witherspoon* questions below. Thus, we find that defendant's tendered questions in this instance were an attempt to reverse-*Witherspoon* the jury and should have been asked. In light of our disposition of this issue, we need not address defendant's third allegation that the trial court improperly excused for cause a prospective juror based on her *Witherspoon* responses. We now turn to defendant's assertions concerning the guilt phase of his trial and his conviction itself.

## TRIAL ISSUES

Defendant alleges that: (1) the trial court improperly limited his cross-examination of the medical examiner; (2) his conviction of aggravated criminal sexual assault was unsupported by the evidence; (3) prosecutorial misconduct occurred both in opening statements and closing arguments; and (4) the trial court erred in not instructing the jury as requested that no presumption flowed from the greater number of witnesses, 17, who testified for the State in contrast to defendant's single witness in his defense.

Defendant initially claims error based on the trial court's sustaining of an objection to his cross-examination of the deputy medical examiner. The deputy medical examiner was a stipulated expert witness with 10 years' experience who had performed over 3,000 autopsies. He testified based on his autopsy of the victim that there was no trauma to her genitalia.

Defendant confessed to having sexual relations with the victim, but argued that such sexual relations had been consensual. Defendant, therefore, sought to elicit an opinion that lack of trauma to a victim's genitalia was

evidence of consensual intercourse, and the witness responded "yes" to the question of whether lack of injury to the genitalia "would be consistent with consensual sex" on cross-examination. On redirect examination, the same witness also responded "no" when asked if lack of injury to the genitals ruled out forced sexual intercourse.

The trial court, however, sustained the State's objections to further cross-examination of the expert on the existence of injury to the genitalia of other bodies on which the witness had performed autopsies, and the witness specifically testified that he could not recall the number of instances where no injury had occurred in the case of forced sex. The trial court also sustained objections to questions of whether the expert had found injury to the genitalia more consistently in instances of forced sex.

Defendant asserts that the trial court erred in sustaining the State's relevancy objections to these questions. However, evidentiary rulings such as these are committed to the sound discretion of the trial court and will only be reversed upon a clear showing of abuse of such discretion. (*People v. Enis* (1990), 139 Ill. 2d 264, 281.) A trial court may reject evidence on the grounds of relevancy if it is remote, uncertain, or speculative. (*Enis*, 139 Ill. 2d at 281.) Expert witness evidence is to be allowed with caution and should not be overused when it fails to aid the jury. (*Enis*, 139 Ill. 2d at 289.) A trial court must exercise discretion and consider both the necessity and relevance of expert testimony in light of the facts of the case before it. (*Enis*, 139 Ill. 2d at 290.) Thus, expert testimony is only necessary when the subject is both particularly within the witness' experience and qualifications and beyond that of the average juror's, and when it will aid the jury in reaching its conclusion. *Enis*, 139 Ill. 2d at 288; *People v. Free* (1983), 94 Ill. 2d 378, 411.

In this instance, defendant's objected-to questions all concerned this expert's experience with *other* victims. In contrast, all of the authority urged by defendant concerned an expert's opinion concerning either the actual defendant or the actual victim in that particular case. See *People v. Salazar* (1988), 126 Ill. 2d 424, 458-61 (expert testimony on sequence of gunshot wounds that resulted in victim's death admissible); *People v. Albanese* (1984), 102 Ill. 2d 54, 73-74 (expert testimony on financial condition of the defendant's company to establish motive for murder); *Free*, 94 Ill. 2d at 411 (expert witness allowed to testify that the defendant's conduct was not consistent with drug intoxication).

In addition, the expert witness specifically disclaimed any recall of the number of forced sex victims who had not suffered injury to their genitalia as a result of such conduct. Absent such recall, any opinion rendered on the consistency or lack thereof of injury in instances of forced sex would have been speculative and uncertain.

Finally, the question posed, which was generally whether injury is more consistent with the use of force, did not require an expert opinion because it was an area well within the experience and knowledge of the average juror. (See *Free*, 94 Ill. 2d at 411.) A trial court is not required to allow an expert to render an opinion on every conceivable question simply because such expert is qualified to do so. The trial court did not abuse its discretion in limiting defendant's cross-examination of this expert witness to opinions uniquely within his qualifications, experience, recall, and regarding this particular victim. See 134 Ill. 2d R. 220; *Enis*, 139 Ill. 2d 264; *Free*, 94 Ill. 2d at 411.

Defendant next asserts that he was not proved guilty beyond a reasonable doubt of aggravated criminal sexual assault, which was the sole basis of his eligibility for the death penalty. Specifically, defendant asserts that the

State failed to prove the *corpus delicti* of the offense of aggravated criminal sexual assault.

Defendant correctly asserts that proof of an offense requires proof of two concepts: first, that a crime occurred, or the *corpus delicti*, and second, that it was committed by the person charged. (*People v. Lambert* (1984), 104 Ill. 2d 375, 378.) In cases where a defendant's confession is part of the proof of the *corpus delicti*, the prosecution must also adduce corroborating evidence independent of a defendant's own statement. (*Lambert*, 104 Ill. 2d at 378-79; *People v. Willingham* (1982), 89 Ill. 2d 352, 358-59.) Such evidence need not rise to the level of proof beyond a reasonable doubt, but must only *tend* to confirm a defendant's confession. (*Howard*, 147 Ill. 2d at 128; *People v. Furby* (1990), 138 Ill. 2d 434, 450, 452; *Lambert*, 104 Ill. 2d at 378.) The particular circumstances must be considered, and every detail need not correspond. (*Furby*, 138 Ill. 2d at 450-51.) In this instance, the *corpus delicti* of aggravated criminal sexual assault requires both evidence of criminal sexual assault, or an act of sexual penetration by the use of force or threat of force (720 ILCS 5/12—13(a)(1) (West 1992)) and evidence of bodily harm (720 ILCS 5/12—14(a)(4) (West 1992)).

The element of bodily harm, which rendered the charged offense aggravated criminal sexual assault in contrast to criminal sexual assault, is not at issue in light of the strangulation of the victim. However, defendant asserts both that the State failed to adduce any evidence, other than his uncorroborated confession, that an act of sexual penetration occurred and that such act was achieved with the use of force or the threat of force.

Turning first to the act of sexual penetration, defendant admitted engaging in both vaginal and anal intercourse with the victim, albeit claiming such sex was consensual. Although his confession was not corroborated

by physical evidence such as trauma to the victim's genitalia or the presence of semen, circumstantial evidence was presented to corroborate defendant's statement. The victim was found nude. A used tampon was recovered, and the victim was menstruating, both of which the defendant acknowledged in his confession. The victim's genitalia were covered with blood in the absence of trauma, consistent with intercourse during menses. Thus, there was sufficient circumstantial evidence to corroborate the act of sexual penetration admitted in defendant's confession.

In support of his contention that he engaged in consensual intercourse with the victim, and, therefore, no force or threat of force occurred, defendant relies on the testimony of the medical examiner noting the absence trauma to the genitalia of the victim. However, the medical examiner also testified that lack of evidence of trauma did not negate the possibility that force had been used. Further, such expert's opinion was limited only to the use of force and did not in any way address the possibility that defendant used the threat of force to criminally sexually assault the victim.

Defendant also relies on the absence of evidence of injury to himself when observed by his next victim, Bradford. However, the victim was only 4 feet 8 inches tall and weighed only 86 pounds. The State noted in opening statements that, in contrast, defendant was 5 feet 10 inches tall and weighed 190 pounds, and his physical superiority was noted throughout the trial. Thus, the trier of fact could have concluded that the absence of injury to defendant was the result of defendant's superior size and strength rather than the result of consent or that defendant accomplished the criminal sexual assault with the threat of force rather than actual force.

In response to defendant's arguments, the State also points to the torn headliner and visor in the brown Oldsmobile as evidence that a struggle occurred and that it occurred sometime between the time the victim's fiance had last seen the car and before Susan Bradford and Jeffrey Sesak entered the car. Although the bruises and abrasions found on the victim's body were relatively minor and were consistent with strangulation, such injuries were also consistent with the use of force. Finally, the State notes the other-crimes evidence overwhelmingly supported the jury's determination that defendant used force or the threat of force to criminally sexually assault the victim.

Although defendant does not dispute that such other-crimes evidence was properly admitted, it is helpful to note the purposes for which such normally inadmissible evidence may be allowed. Relevant other-crimes evidence is admissible in the trial court's discretion to show *modus operandi*, a common design or plan, intent, motive, identity, knowledge, or the absence of mistake (*People v. Illgen* (1991), 145 Ill. 2d 353, 364-65) or as evidence of defendant's state of mind in rebuttal of a defense of insanity (*People v. Buggs* (1986), 112 Ill. 2d 284, 290). Conversely phrased, other-crimes evidence is admissible, if relevant and not unduly prejudicial, to show anything other than a defendant's mere propensity to commit a crime. *People v. Evans* (1988), 125 Ill. 2d 50, 82-83; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182.

In this instance in the space of a few hours, defendant shared the victim's brown Oldsmobile with three women, one of whom was the victim herself. Both of the surviving two women who had occupied the brown Oldsmobile testified that defendant attempted to sexually assault them after showing each of them the victim's dead body and threatening that unless they complied with his sexual demands, they would face a similar fate. Two

hours later, defendant attempted to assault a fourth woman with whom he was acquainted in her home, also threatening her. Defendant admitted killing a fifth woman in her car still later.

In all but one instance, Halili, defendant met the women in a neighborhood bar. Again in all but one instance, this time Goodman, the incident took place in a car and, in fact, took place in the victim's car in three instances. In the case of the three surviving women, each testified that defendant threatened her. Two testified that defendant actually threatened them using the victim's dead body and implicitly admitted killing the victim because she had not consented to his sexual advances. In every case, the woman was choked or strangled. Defendant tore at the clothing of two of the three women who survived his attacks, and Cooney's torn clothes were recovered from her body and beneath the seat of her car. Although none of the recovered clothing of the victim was torn, her panties and slacks were never recovered, nor was the missing clothing of Halili and Bradford recovered. Thus, the evidence of defendant's other crimes overwhelmingly supported the determination of the trier of fact in this instance that sexual conduct occurred and was achieved through the use of force or threat of force.

The opening statement and closing argument of the prosecution are the basis of several alleged errors, which we next address together. Defendant alleges that the State: (1) improperly alluded to the victim's marital status and child in opening statements; and, in closing argument, argued that (2) the blood found on the victim allowed only "one inference," that of sexual assault; and (3) defendant's insanity defense had been contrived to escape responsibility for his crimes because defendant's expert had spent less time with defendant than many of the State's witnesses.

Initially, errors such as those alleged are waived if not preserved by both a contemporaneous objection and a post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 198-99.) Because defendant failed to thus preserve these issues, his allegations of error are waived. Defendant, however, urges us to consider these alleged errors under the plain error doctrine.

Under the plain error doctrine, if the evidence is closely balanced or the error is of such magnitude that the defendant has been denied a fair trial, waiver is not applicable. (*People v. Barrow* (1989), 133 Ill. 2d 226, 228; *People v. Owens* (1984), 102 Ill. 2d 88, 104.) The State is allowed to comment on what the expected evidence will be and reasonable inferences therefrom in opening statements (*People v. Smith* (1990), 141 Ill. 2d 40, 63) and is given wide latitude in closing argument (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175). Absent deliberate misconduct, incidental and uncalculated remarks in opening statement cannot form the basis of reversal (*People v. Thomas* (1990), 137 Ill. 2d 500, 525), and comments in closing argument must be considered in context of the entire closing argument of both the State and the defendant (*Cisewski*, 118 Ill. 2d at 175-76). In closing argument, the prosecution is allowed to comment on the evidence and the strength of its case and to urge the fearless administration of justice and the detrimental effect of crime. (*Barrow*, 133 Ill. 2d at 270.) The trial court has discretion to determine the proper character and scope of argument, and every reasonable presumption is indulged that such discretion was properly exercised. (*Cisewski*, 118 Ill. 2d at 175; *Morgan*, 112 Ill. 2d at 131; *People v. Smothers* (1973), 55 Ill. 2d 172, 176.) Finally, errors in opening statements or closing argument must result in substantial prejudice such that the result would have been different absent the complained-of remark before reversal is required. *People v. Hender-*

*son* (1990), 142 Ill. 2d 258, 322-23; *People v. Mullen* (1990), 141 Ill. 2d 394, 407; *Cisewski*, 118 Ill. 2d at 175; *Morgan*, 112 Ill. 2d at 132.

In opening statements, the prosecutor described the victim and included the fact that she had been previously married and had a child, had moved home to live with her mother when that marriage ended, and was engaged to be married. The victim's mother and fiance testified similarly in describing the events that occurred after the victim failed to return from work on January 28, 1993, and their attempts to locate her. Common sense dictates that a victim does not live in a vacuum (*People v. Yates* (1983), 98 Ill. 2d 502, 530; *Free*, 94 Ill. 2d at 415), and evidence of a victim's family relations is admissible to the extent necessary to properly present the prosecution's case (*Barrow*, 133 Ill. 2d at 272). Thus, the prosecutor's comments concerning the victim's family and the similar evidence admitted were merely incidental to the presentation of the State's case and were not deliberate misconduct to inject irrelevant and prejudicial matters into the trial (see *Thomas*, 137 Ill. 2d at 525).

The victim's body was found displayed in the trunk of her car naked and with blood both on her nose and mouth and on her genitalia. The victim's car, with her body in the back seat and used as a prop to emphasize defendant's threats, was the scene of defendant's attempts to criminally sexually assault two other women. The prosecutor's closing argument that only one inference could be drawn from such facts was merely argument of a reasonable inference from the evidence adduced (see *People v. Johnson* (1991), 146 Ill. 2d 109, 143; *Owens*, 102 Ill. 2d at 105).

The prosecutor's argument concerning defendant's expert witness was again based on the evidence of the amount of time such witness spent with defendant, and was argument directed to the credibility of such witness

and the implausibility of defendant's insanity defense, both of which are proper subjects of closing argument. (*People v. Flores* (1989), 128 Ill. 2d 66, 94-95 (credibility of witnesses); *People v. Hope* (1990), 137 Ill. 2d 430, 491 (implausibility of defense), *vacated on other grounds* (1991), 501 U.S. 1202, 115 L. Ed. 2d 966, 111 S. Ct. 2792, *modified* (1992), 147 Ill. 2d 315.) Finally, in light of the overwhelming evidence discussed in refuting defendant's *corpus delicti* claim, none of these alleged prejudicial comments were of a magnitude sufficient to have altered the trier of fact's determination of defendant's guilt. (See *Cisewski*, 118 Ill. 2d at 175.) Thus, the plain error doctrine is inapplicable.

Defendant's last alleged error during the guilt phase of his trial is that the trial court improperly refused to give his tendered jury instruction that no presumption flowed from the greater number of witnesses presented by the State, which was based on a civil Illinois Pattern Jury Instruction (IPI) (see Illinois Pattern Jury Instructions, Civil, No. 2.07 (3d ed. 1992)). An applicable IPI instruction is to be given, unless it does not adequately state the law (134 Ill. 2d R. 451(a); *People v. Haywood* (1980), 82 Ill. 2d 540, 545), and a trial court is vested with discretion to determine the propriety of jury instructions (*People v. Dower* (1991), 218 Ill. App. 3d 844, 852). Although defendant's tendered instruction correctly stated the law in *civil* cases, there is no comparable criminal IPI instruction.

In addition, the committee comments concerning expert testimony in criminal cases specifically advise against any comment on the weight to be given such testimony. (Illinois Pattern Jury Instructions, Criminal, No. 3.18 (3d ed. 1992).) As we have noted, defendant presented his insanity defense entirely through the testimony of one witness, his expert psychiatrist, and defendant's tendered jury instruction was directed to the

weight of such testimony. Thus, in light of the lack of an IPI criminal instruction and the committee comments warning against any comment on the weight of expert testimony, the trial court did not abuse its discretion in refusing to give defendant's tendered instruction.

## SENTENCING ISSUES

Because of our disposition of the reverse-*Witherspoon* jury-selection issue raised, defendant will receive a new sentencing hearing. Thus, we do not address the additional issues raised concerning his sentencing hearing.

## CONSTITUTIONAL ISSUES

Defendant asserts that the Illinois death penalty statute violates the eighth and fourteenth amendments of the United States Constitution because it places the burden of proof on a defendant, which precludes meaningful consideration of mitigation evidence and does not sufficiently minimize the risk of arbitrary or capricious imposition of the death penalty. This court has previously rejected such arguments. See *People v. Bean* (1990), 137 Ill. 2d 65, 138-40; *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43.

We affirm defendant's conviction but find that the trial court's refusal to reverse-*Witherspoon* the jury as requested violated defendant's due process rights under the fourteenth amendment. *Morgan v. Illinois*, 504 U.S. at 731-32, 119 L. Ed. 2d at 504, 112 S. Ct. at 2230-31.

Therefore, defendant's convictions are affirmed, but his death sentence is vacated. The cause is remanded to the circuit court for a new sentencing hearing consistent with this opinion.

*Convictions affirmed;*
*death sentence vacated;*
*cause remanded.*