THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
THOMAS SHAW, Defendant-Appellant.

First District (2nd Division)   No. 1—94—0291

Opinion filed March 26, 1996.—Rehearing denied May 1, 1996.

940

Rita A. Fry, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, and James S. Beligratis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Following a jury trial, defendant Thomas Shaw was found guilty of first degree murder and aggravated criminal sexual assault. He was sentenced to natural life imprisonment for the first degree murder with a concurrent 60-year term for the aggravated criminal sexual assault. In this appeal, he contends that (1) the State improperly introduced evidence and commented about his post-arrest silence in violation of *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976); (2) the circuit court erred in admitting expert testimony concerning the source of a mark on his shoulder; (3) the *corpus delicti* of aggravated criminal sexual assault was not proved; (4) the admission of hearsay deprived him of a fair trial; (5) the circuit court erred in refusing to instruct the jury on second degree murder; (6) the State's closing arguments were improper; and (7) there was no justification for the imposition of a natural life sentence. For the reasons that follow, we affirm.

At trial, Chicago police officer Daniel Keenan testified that on April 11, 1991, at approximately 4:20 a.m., he and his partner, Officer Randall Curylo, were travelling southbound on Lavergne Avenue in a marked squad car. Officer Curylo noticed that a white Pon-

tiac was parked against a dumpster in an alley near Schubert Street. Because the car looked out of place, the officers decided to investigate. As they pulled into the alley, they noticed a head pop up and then duck down below the level of the hood of the car. As Officer Keenan exited the squad car, defendant stood up and looked directly at him. When Officer Keenan shouted, "freeze, police," defendant started to run west, with the officers in pursuit. Officer Keenan lost sight of defendant when he ran into a gangway.

Officer Curylo picked up Officer Keenan and they returned to the Pontiac. There, they saw a deceased woman, later identified as Angie Gavaris, lying between the car and the garage. The car's rearview mirror was knocked off the window, cassette tapes on the front seat were in disarray, and Q-tips were strewn around the back seat.

Officer Gregory Bella testified that Gavaris had black eyes, swollen cheeks, blood coming from her mouth and neck, and a ligature mark around her neck. Her pants were open revealing her underwear, one breast was exposed, and there was blood on her blouse.

Officer Bella and his partner, Officer Frank Saenz, went to the gangway where Officer Keenan had last seen defendant. They were checking yards in the area when Officer Bella noticed the bottoms of a pair of gym shoes sticking out from the bottom of stairs leading to an enclosed back porch. When he noticed that the shoes were occupied by somebody, he pulled out his service revolver and told the person to put his hands up and not to move. Defendant lunged at Officer Bella, knocking him into a wall and grabbing his gun. A struggle ensued, and the gun fired twice. The gun went off a third time, grazing Officer Saenz, who grabbed defendant as he attempted to flee. Defendant continued to resist and the officers were unable to control him. They were able to handcuff him only after receiving assistance from two paramedics who had arrived at the scene.

Detective William Johnston testified that while investigating the case, he learned that defendant, who had been shot in the hand while resisting the arrest, was in custody at Illinois Masonic Hospital but was not communicating. In order to learn if defendant was deaf or mute, he contacted Officer Dan Levin, a certified hearing impairment signer. Officer Levin attempted to communicate with defendant using sign language but defendant did not respond. The following day, however, defendant had no trouble speaking.

Detective William Dorsch testified that he introduced himself to defendant at the hospital and defendant made a moaning sound and pointed to his ear. The next day, he interviewed defendant at Area 5 Violent Crimes. When he told defendant that he knew that he did not have a speech or hearing impediment, defendant began to speak.

After Detective Dorsch read defendant his *Miranda* rights, defendant told him that when he was first seen by the police officers, he was taking Gavaris' body out of the car, intending to place her in the dumpster. Defendant stated that he forced her into the car; that "she hurt me so I hurt her back"; and that he hit her and choked her until she stopped. When asked whether he had sex with her, defendant began mumbling incoherently and Detective Dorsch terminated the interview. Defendant also stated that he pretended to be deaf and dumb because he was angry at the police because they shot him during his arrest.

Assistant State's Attorney David O'Connor testified that while assigned to the felony review unit on April 13, 1991, he interviewed defendant. Although defendant initially was uncommunicative, again mumbling and shrugging his shoulders as if he did not understand, he responded affirmatively to each *Miranda* warning after O'Connor told him that family members had stated that he was not deaf. Defendant told O'Connor that he had a drinking problem for which he needed help. He also told O'Connor that the police officer who found him had fired a gun at his head from approximately two feet away. He said that he never resisted arrest.

Defendant further told O'Connor that he first met Gavaris at Oak Street beach, where she was jogging. They struck up a conversation and later he saw her driving in a white Camaro and she waved and stopped the car. According to defendant, they had consensual sexual intercourse in the front seat of her car, an argument ensued, and he strangled her.

Yasmeen Kahn, Gavaris' best friend, testified that she last saw Gavaris on April 11, 1991, at approximately 5:15 p.m., when Gavaris stopped by to ask her to go to the health club that evening. Gavaris did not jog or date anyone, and she never mentioned defendant.

Dr. Choi, assistant medical examiner, testified that Gavaris' vaginal area sustained bruising, soft tissue swelling, and hemorrhage consistent with forced sex. Gavaris also sustained extensive bruising to her arms and legs and received a head injury consistent with being struck by a hand or fist. She had a ligature mark on her neck and her thyroid cartilage bone was fractured. Gavaris had been strangled to death.

There was evidence that a grey jacket found inside Gavaris' car belonged to defendant's brother, that hair matching defendant's head and pubic hair was on the jacket, and that defendant wore the jacket the day of the killing. There was also evidence that head and pubic hair found on Gavaris' clothing matched defendant's head and pubic hair and that head and pubic hair found on defendant's clothing matched that of Gavaris.

During trial, defendant filed a motion *in limine* to bar Dr. John Kenney from testifying as an expert as to the cause of a mark on defendant's shoulder. Dr. Kenney was to opine that the mark was caused by the orthodontic braces on Gavaris' teeth. Out of the presence of the jury, Dr. Kenney testified that he was a licensed dentist and chief forensic odontologist for the Cook County medical examiner's office. Part of his research involved bite mark identification, or comparing a wound with the biting edge of the teeth of the person suspected of causing the mark. According to Dr. Kenney, that would technically be considered a toolmark, or an object marking the victim's body. Most bite mark circumstances involve a clearly identifiable injury caused by human teeth and the issue is the identification of the teeth. The instant situation, however, involved an impact injury, the nature and cause of which were initially uncertain. Dr. Kenney admitted that he was not a certified toolmark examiner. Finding that defendant's argument was a semantic one going to weight rather than admissibility, the circuit court allowed Dr. Kenney to testify.

Dr. Kenney testified that he observed in a photograph of defendant an "area of interest" on his upper left front shoulder. When he first took dental impressions from Gavaris' body for the purposes of potential bite mark identification, he was concerned with the biting edge rather than with her orthodontic brackets. He compared the models that he made with photographs of defendant, whom he had previously examined, and decided that the injury on defendant's shoulder was not caused by human teeth.

Dr. Kenney reexamined Gavaris' body, however, and took a new set of impressions by removing the arch wires, which are wires placed inside the brackets and used to move the teeth, from the dentition. He did this in order to get an accurate impression of the orthodontic brackets on her teeth. Gavaris' teeth and the brackets were stable in her mouth even with the arch wires removed. After comparing the mold he had made of the dentition and brackets on Gavaris' teeth with the injury on defendant's left shoulder, Dr. Kenney concluded that the injury was caused by the brackets, although he never attempted to eliminate other sources as the cause of the injury.

The jury found defendant, who was also charged with aggravated kidnapping, guilty of first degree murder and aggravated criminal sexual assault. Although the jury determined that he was eligible to receive the death penalty, it found sufficient mitigating factors to preclude its imposition. The circuit court sentenced him as previously stated, and this appeal followed.

## POST-ARREST SILENCE—THE *DOYLE* ISSUE

Defendant first contends that he was denied a fair trial by the testimony and closing argument concerning his feigned inability to hear or communicate. The gist of the testimony of O'Connor and of Detectives Johnston and Dorsch was that, although defendant initially feigned an inability to hear and communicate, when confronted with his pretense, he capitulated and spoke.

During closing argument, the State argued as follows:

"Now, why would Thomas Shaw say those things? Why would he admit? I'm sure the argument will come up. Why would he admit to having done this thing when for a period of time he wouldn't talk to anybody?

* * *

He was in control of the situation. Thomas Shaw, whether he was talking to Detective Dorsch or Dave O'Connor, never told them anything that he didn't already know; never admitted to anything that he didn't already know. When he still thought he had fooled them into thinking he was a deaf mute, that was great. Didn't want to talk. When did he start to talk? The minute he came forward and said 'Tom, we have talked to your family. We've talked to people who know you. You're not a deaf mute; come on.' Oh, then he shrugs and kind of smiles. Okay. I'll talk to you."

In rebuttal closing argument, the State continued:

"He had control over their guns. That's what Thomas Shaw is about. That's what kind of person he is. He goes to the hospital and he is injured and plays deaf mute. Yes, he is playing a game. He pretends that he is a deaf mute. That way no one can talk to him, the hospital people couldn't even talk to him until later. He wouldn't even talk to them."

Defendant asserts that the foregoing was improper commentary on his invocation of his post-arrest silence in violation of *Doyle*, 426 U.S. at 18, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.

■ Initially, defendant has waived this issue by his failure to object at trial. *People v. Enoch*, 122 Ill. 2d 176, 185, 522 N.E.2d 1124 (1988). Where the evidence is closely balanced or the errors complained of are of such magnitude that they deprive defendant of a fair trial, however, the reviewing court will invoke plain error so that it can determine whether a trial error enhanced the possibility that an innocent person may have been convicted. *People v. Mullen*, 141 Ill. 2d 394, 402, 566 N.E.2d 222 (1990).

Here, the evidence was by no means closely balanced. The uncontradicted evidence showed that defendant was discovered next to Gavaris' car and body and that he fled from police when they attempted

to apprehend him. Defendant subsequently admitted to murdering Gavaris. Although he claimed that the sex was consensual, Gavaris' vaginal area sustained bruising, soft tissue swelling, and hemorrhage consistent with forced sex; her clothes were in disarray; she sustained extensive bruising to her arms and legs; and she received a head injury consistent with being struck by a hand or fist. A mark on defendant's shoulder was identified as coming from Gavaris' braces and Gavaris' car was found in a state of disarray. Also impeaching defendant's version of events was Kahn's testimony that Gavaris did not jog. Thus, the first prong of the plain error analysis was not satisfied here.

As for the second basis of plain error consideration, it should be invoked only where the error is "so fundamental to the integrity of the judicial process and so prejudicial to the defendant that the trial court could not cure the error by sustaining an objection or instructing the jury to disregard the error." *People v. Herrett*, 137 Ill. 2d 195, 215, 561 N.E.2d 1 (1990). The Illinois Supreme Court has held that a *Doyle* violation, although improper, is not an error of such magnitude as to deprive the defendant of a fair trial. *Herrett*, 137 Ill. 2d at 215; *People v. Stewart*, 104 Ill. 2d 463, 488, 473 N.E.2d 1227 (1984). Thus, even assuming defendant could establish a *Doyle* violation, procedural default would not render it grounds for reversal. *Herrett*, 137 Ill. 2d at 215-16.

■ Waiver aside, in *Doyle*, the Supreme Court held that every post-arrest silence is "insolubly ambiguous" because an arrestee may be invoking his constitutional right to remain silent rather than tacitly admitting his guilt. *Doyle*, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244. Because of that insoluble ambiguity, it is fundamentally unfair and a violation of due process for the prosecution to use a defendant's post-arrest silence to impeach his exculpatory testimony. *Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.

We reject defendant's contention that we should infer that he invoked his fifth amendment right to remain silent by feigning an inability to communicate. We find no constitutional invocation where defendant's affectation simply raised a question as to his inability, not his unwillingness, to communicate.[1] Defendant's own explanation—that he feigned the inability to hear or communicate because

---

[1]Defendant erroneously claims that the Seventh Circuit in *United States ex rel. Doss v. Benzinger*, 463 F.2d 576 (7th Cir. 1972), held that the defendant indicated his desire to remain silent by "acting like a mute." In *Doss*, the defendant, who was in custody, "remained mute" after being advised of

he was angry with the police—further resolves potential ambiguity regarding the purpose behind his silence. The fifth amendment affords no protection to those who play manipulative games because they are angry with the police.

The testimony and remarks concerning defendant's feigned inability to communicate did not deprive him of a fair trial in violation of *Doyle*.

## EXPERT TESTIMONY

Defendant's next contention is that he was deprived of a fair trial by the circuit court's denial of his motion *in limine* to bar Dr. Kenney's testimony that the mark on his shoulder was caused by Gavaris' braces. He asserts that because such testimony was within the ken of a toolmark examiner, it was beyond Dr. Kenney's scope of expertise as a forensic odontologist.

■ An expert is a person who, because of education, training or practical experience, possesses knowledge beyond that of the average citizen. *People v. Novak*, 163 Ill. 2d 93, 104, 643 N.E.2d 762 (1994). Regardless of how acquired, if a witness has that knowledge and it would assist the jury in evaluating the evidence, he may testify as an expert. *Novak*, 163 Ill. 2d at 104. The determination of whether a witness qualifies as an expert rests within the sound discretion of the circuit court. *Novak*, 163 Ill. 2d at 104.

Because of the unique quality of an individual's dentition, testimony concerning bite mark identification is admissible in Illinois. *People v. Milone*, 43 Ill. App. 3d 385, 396-97, 356 N.E.2d 1350 (1976); *People v. Prante*, 147 Ill. App. 3d 1039, 1062, 498 N.E.2d 889 (1986). Such testimony falls within the category of circumstantial evidence and involves the question of weight and credibility rather than competency. *Milone*, 43 Ill. App. 3d at 397.

■ Dr. Kenney, an acknowledged expert in bite mark identification, had knowledge, training, and experience regarding injuries caused by orthodontics that was beyond that of the average citizen. Although he characterized the instant case as one involving a toolmark, or a mark on the victim's body caused by an object, he also characterized bite marks as toolmarks because teeth are unique tools

---

his *Miranda* rights and after being asked to waive those rights. *Doss*, 463 F.2d at 577. After another pair of police officers advised him of his rights, he "again indicated that he would make no statement." *Doss*, 463 F.2d at 577. Thus, although the Seventh Circuit used the word "mute" as a synonym for "silent," nothing in the facts of *Doss* indicates that the defendant was unable to speak or feigned the inability to do so. Rather, it is clear that he was simply unwilling to do so.

carried in the body. Moreover, he testified that he had previously been qualified as a toolmark examiner; that toolmark identification and bite mark identification overlap quite a bit; that he was familiar with comparing a dental appliance with an injury; that he had done a limited amount of orthodontics; and that he was familiar with orthodontic techniques, including the design of brackets. Also, the methodology which he followed—making a mold and comparing it with a photograph of the injury—was precisely what he used in comparing the biting edge of teeth. The circuit court did not abuse its discretion in qualifying Dr. Kenney as an expert.

■ As for Dr. Kenney's methodology, defendant contends it was unreliable because he removed the arch wires that connect the brackets before making his impression. Defendant asserts that removing the wires could have altered the impact of the impression. Dr. Kenney, however, testified that the teeth and the brackets were stable in the mouth even with the arch wires removed. Because the brackets and teeth were immovable even without the arch wires, we reject defendant's contention. Also, although defendant cross-examined Dr. Kenney, he produced no expert to counter either his qualifications or his methodology. Accordingly, we conclude that defendant's arguments go to the weight of the evidence rather than to admissibility.

## *CORPUS DELICTI* ISSUE

■ Defendant's next contention is that the State failed to prove the *corpus delicti* of the offense of aggravated criminal sexual assault. In a *corpus delicti* challenge, a defendant alleges not that the State failed to prove him guilty of the crime beyond a reasonable doubt but that there is insufficient evidence to indicate that a crime occurred at all. *People v. Jones*, 156 Ill. 2d 225, 241, 620 N.E.2d 325 (1993). Proof of *corpus delicti* must be established by evidence independent of a defendant's confession. *People v. Lambert*, 104 Ill. 2d 375, 378-79, 472 N.E.2d 427 (1984). The *corpus delicti* of aggravated criminal sexual assault, as alleged in this case, required evidence of an act of sexual penetration by the use of force or threat of force (720 ILCS 5/12—13(a)(1) (West 1992)) and evidence of bodily harm (720 ILCS 5/12—14(a)(2) (West 1992)). *People v. Cloutier*, 156 Ill. 2d 483, 503, 622 N.E.2d 774 (1993).

Here, as in *Cloutier*, the element of bodily harm is not at issue in light of the strangulation of the victim. Thus, at issue is whether the State has adduced evidence in addition to defendant's statement that an act of sexual penetration occurred and that such act was achieved with the use of force or the threat of force. *Cloutier*, 156 Ill. 2d at 503.

In *Cloutier*, the murder victim was discovered in the trunk of a car wearing only her watch and socks and with blood on her face, abrasions on her knees and one arm, bruises on her neck and face, and blood and fecal matter on her buttocks and vaginal area. *Cloutier*, 156 Ill. 2d at 493. The defendant admitted strangling the victim but claimed that they had engaged in consensual sex. *Cloutier*, 156 Ill. 2d at 493. The supreme court held that the *corpus delicti* of aggravated criminal sexual assault was overwhelmingly established by the confession of the defendant, the condition and appearance of the victim, the condition of the car, and other crimes evidence. *Cloutier*, 156 Ill. 2d at 504-06.

■ Here, as for the sexual penetration, defendant admitted that it occurred. Moreover, Gavaris' pants were undone, her breast was exposed, she had blood on her blouse, and her vaginal area sustained injuries consistent with forced sex. Other circumstantial evidence consistent with the use of force included Gavaris' other injuries: she had black eyes, swollen cheeks, blood coming from the mouth and neck, extensive bruising to her arms and legs, and a head injury consistent with being struck by a hand or fist. The condition of her car also provided circumstantial evidence of force: the rearview mirror was knocked off the window, cassette tapes on the front seat were in disarray, and Q-tips were strewn around the back seat. *Cf. Cloutier*, 156 Ill. 2d at 504-05. Accordingly, we conclude that the evidence adduced at trial was more than sufficient to prove bodily harm and an act of sexual penetration by the use of force or threat of force. Defendant's *corpus delicti* challenge must be rejected.

## HEARSAY ISSUES

Defendant next argues that the cumulative erroneous admission of hearsay deprived him of a fair trial. Hearsay is an out-of-court statement offered in court to show the truth of the matter asserted. *People v. Anderson*, 113 Ill. 2d 1, 11-12, 495 N.E.2d 485 (1986). The circuit court's ruling as to the admissibility of evidence will not be reversed absent an abuse of discretion. *People v. Thingvold*, 145 Ill. 2d 441, 452-53, 584 N.E.2d 89 (1991).

■ Defendant first challenges the admission of Kahn's testimony that Gavaris was not dating anyone and had never mentioned defendant. Because defendant did not cross-examine her as to the origin of her knowledge that Gavaris was not dating anyone, we have no basis for determining whether that knowledge was hearsay or derived from personal observation. Conceding for the sake of argument that the admission of Gavaris' nonmention of defendant implicates the hearsay rule, any error in its admission must be deemed harmless in

view of defendant's statement that he had talked to Gavaris only one time before the date of her death.

Defendant also maintains that testimony from O'Connor that defendant told him that he needed counselling for his drinking was improperly admitted as an admission. Defendant argues the statement had no relevance to the offense and did not otherwise permit an inference of guilt. Generally, any unprivileged statement by the accused may be used against him as an admission. *People v. Aguilar*, 265 Ill. App. 3d 105, 110, 637 N.E.2d 1221 (1994), *appeal denied*, 157 Ill. 2d 506, 642 N.E.2d 1286 (1994). A false exculpatory statement attempting to shift blame is admissible as being probative of a defendant's consciousness of guilt. *People v. Seawright*, 228 Ill. App. 3d 939, 969, 593 N.E.2d 1003 (1992), *appeal denied*, 146 Ill. 2d 646, 602 N.E.2d 470 (1992). Here, the circuit court did not abuse its discretion in admitting the complained-of testimony, where the statement by defendant was not privileged and where it tended to show that he attempted to blame his drinking problem when there was no evidence that alcohol was involved.

As for defendant's allegation regarding O'Connor's volunteering that defendant told the detectives that he forced Gavaris into her car, an objection was sustained and the jury was instructed to disregard it. Thus, any prejudice to defendant was cured. *People v. Fort*, 147 Ill. App. 3d 14, 25, 497 N.E.2d 416 (1986).

Defendant was not deprived of a fair trial by any erroneous admission of hearsay.

### JURY INSTRUCTION FOR SECOND DEGREE MURDER

Defendant's next contention is that the circuit court erred in refusing his request for a jury instruction on second degree murder. He contends that his statement that Gavaris "hurt" him indicates mutual combat entitling him to that instruction.

The function of jury instructions is to convey the correct principles of law applicable to the evidence adduced at trial. *People v. Manley*, 222 Ill. App. 3d 896, 913, 584 N.E.2d 477 (1991). The slightest amount of evidence will justify giving an instruction. *People v. Garcia*, 169 Ill. App. 3d 618, 620, 523 N.E.2d 992 (1988), *appeal denied*, 122 Ill. 2d 584, 530 N.E.2d 255 (1988). The trial court rulings on jury instructions will not be disturbed absent an abuse of discretion. *People v. Curtis*, 262 Ill. App. 3d 876, 890, 635 N.E.2d 860 (1994), *appeal denied*, 157 Ill. 2d 509, 642 N.E.2d 1289 (1994).

"Mutual combat is a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from

the combat." *People v. Austin*, 133 Ill. 2d 118, 125, 549 N.E.2d 331 (1989). The provocation must be proportionate to the manner in which the defendant retaliated. *Austin*, 133 Ill. 2d at 127. Struggling with an attacker in an effort to ward off an assault is not sufficient to warrant a provocation instruction. *People v. Lewis*, 229 Ill. App. 3d 874, 594 N.E.2d 414 (1992), *appeal denied*, 146 Ill. 2d 642, 602 N.E.2d 466 (1992).

■ Here, although defendant made a self-serving statement that Gavaris hurt him, there was no evidence other than the mark on defendant's shoulder to show the truth of that claim. Rather, the evidence showed that Gavaris was beaten, strangled, and sexually assaulted. Even assuming that Gavaris had bitten defendant for no reason, his retaliatory strangulation was out of all proportion to her attack. Moreover, there was no evidence that indicated that the struggle was on equal terms. Defendant's contention that there was evidence of mutual combat, a contention that tests the boundary of vigorous advocacy, must be rejected.

## CLOSING ARGUMENT ISSUES

Defendant complains of improprieties in the State's closing argument. Prosecutors are afforded wide latitude in closing argument and may comment upon the evidence and all legitimate inferences therefrom. *People v. Albanese*, 102 Ill. 2d 54, 77-78, 464 N.E.2d 206 (1984).

■ Defendant first argues that the State went beyond the bounds of argument to buttress its kidnapping theory. Because defendant was found not guilty of that charge, even if there was error in the argument, it was harmless.

He next contends that the State improperly made comments solely to inflame the passion of the jury. He asserts that the State in closing argument repeatedly referred to Gavaris as a nice, shy, religious girl, but his citation to the record reveals no such comment during closing arguments. Although the State did make such a characterization during opening statements, defendant did not contemporaneously object and his argument is therefore waived. *Enoch*, 122 Ill. 2d at 185-86. In any event, he has failed to show how this one brief reference was prejudicial.

We reject defendant's claim that the State's remark in reference to his resisting arrest, that "we're lucky we didn't have two more deaths," was inflammatory. The evidence adduced at trial showed that, during his arrest, defendant violently struggled and that three shots were fired, one of which grazed the head of Officer Saenz. The State's argument was a legitimate inference from that evidence.

Defendant also refers to the State's argument that O'Connor

would not come in and concoct a story because to do so would be to put his law license on the line. Defendant has again waived this issue by his failure to contemporaneously object. *Enoch*, 122 Ill. 2d at 185-86. Moreover, the evidence against defendant was overwhelming. Thus, even if the comments were error, there is no basis for concluding that the remarks prejudiced defendant or otherwise deprived him of a fair trial.

## SENTENCING ISSUE

Defendant contends that his natural life sentence is unjustified. He contends that the evidence was insufficient to support the charge of aggravated criminal sexual assault or a finding that the crime was exceptionally brutal and heinous. Thus, according to defendant, his sentence of natural life was excessive.

A term of natural life imprisonment is authorized where a murder is accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty, as well as where the victim was murdered during the course of an aggravated criminal sexual assault. 730 ILCS 5/5—8—1(a)(1)(b) (West 1992); 720 ILCS 5/9—1(b)(6)(c) (West 1992). Absent a clear abuse of discretion, the sentence imposed by the circuit court will not be disturbed on review. *People v. Harris*, 187 Ill. App. 3d 832, 843, 543 N.E.2d 859 (1989). It was not an abuse of discretion for the circuit court to impose a term of natural life where the evidence satisfied either or both criteria for the imposition of such a sentence.

The judgments of the circuit court are affirmed.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.