# Illinois Official Reports

## Appellate Court

---

### *People v. Trotter*, 2015 IL App (1st) 131096

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLARENCE TROTTER, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-13-1096 |
| Filed | June 30, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-3851; the Hon. James B. Linn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Brian A. McNeil, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Peter Fischer, and Kathleen Warnick, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE COBBS delivered the judgment of the court, with opinion.<br>Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant Clarence Trotter was convicted of murder pursuant to section 9-1(a)(1) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(1) (West 2006)), and sentenced to natural life in prison. On appeal, defendant contends that the trial court erred in finding that he made a knowing and voluntary waiver of his right to counsel. Additionally, he argues that the prosecutors in this case improperly inflamed the passions of the jury by eliciting irrelevant testimony about the victim and her fiancé, previewing this testimony in opening statement, and relying on it in closing argument.

¶ 2                                          BACKGROUND

¶ 3    On September 20, 1981, Marilyn Dods was found dead in her studio apartment. Developments in DNA testing linked defendant, who was already serving a life sentence based on a previous murder conviction, to the murder. Defendant was formally charged with Dods' murder on January 8, 2007. Assistant Public Defender Joseph Kennelly was appointed to represent defendant.[1] During the first court date on March 1, 2007, after consulting with defendant, defense counsel informed the court that defendant wanted to motion to demand trial although counsel was not adequately prepared to represent defendant at trial. The court told defendant that "your lawyer is telling me one thing and you're telling me something else, it puts me in a bit of a conflict because I can only hear from one voice. Either your lawyer is representing you or you are going to be representing yourself." The court further explained that defendant was facing a serious case and that his attorneys did not have all of the information they needed to proceed to trial. Defendant informed the court that in the past he had litigated motions while a speedy trial demand was pending. He then agreed to be represented by counsel and asked the court to be sent back to the Illinois Department of Corrections rather than the Cook County jail because he was going *pro se* on other cases. He told the court "I do law," and "I know my rights. I'm cool. Trust me."

¶ 4    On March 22, 2007, both parties tendered discovery. Defendant asked for a copy of all discovery documents. The court informed defendant that because he was not representing himself *pro se* his attorney would show him the documents. On April 25, 2007, the State tendered its "Notice of Intent to Seek Death." On July 18, 2007, defense counsel filed two motions on defendant's behalf; one to dismiss for failure to commence the prosecution and another challenging the constitutionality of Illinois's death penalty statute. Defense counsel told the court that defendant wanted to demand trial but that he needed time to view a video of defendant's recorded statement. The court then told defendant that his counsel "is trying very hard to defend you properly and really thinks he ought to see what the evidence is before he starts answering ready for trial." Defendant said he understood but wanted to file a motion for discovery. The court informed defendant that he would only hear from "one voice" speaking on behalf of his defense. The court instructed defense counsel to redact discovery documents and let defendant view them.

---

[1]Kennelly retired from the public defender's office and joined the capital trial assistance unit of the State Appellate Defender's office during his representation of defendant, but continued to represent defendant along with Stephen Richards from the same unit.

¶ 5          Defendant continued to be represented by counsel, who filed and argued various motions on behalf of defendant from October 24, 2007 through May 24, 2010.[2] During a May 24, 2010, status hearing the State informed the court that it had received a motion for a speedy trial from defendant, and the case was continued for defendant's presence in court. On May 27, 2010, the court again informed defendant that he could not file his own motions while being represented by counsel. Defendant withdrew his demand for trial, and the court told defendant,"[y]ou have lawyers and if you start filing your own motions, I can't hear from both [of you] at the same time. You're going to end up representing yourself. You can't keep doing that."

¶ 6          On November 29, 2010, the court set the trial for April 4, 2011. During a status hearing on January 21, 2011, the court stated that the Illinois legislature had passed legislation abolishing capital punishment, and that the legislation was awaiting the Governor's signature. On April 4, the court announced that the death penalty was no longer a possible sentence and the State Appellate Defender capital litigation unit withdrew. Assistant Appellate Defender Jack Rimland continued to represent defendant, but subsequently withdrew for personal reasons. The court reappointed Assistant Public Defender Patrick White to represent defendant. Defendant then renewed his motion for a speedy trial. The court asked defendant if he wanted to represent himself, and defendant stated that "I have never said, Mr. Linn, that I move to represent myself. I said I move to–for a speedy trial. That is my right." The court told defendant that his new counsel needed time to get acquainted with his case.

¶ 7          On five separate court dates, defendant continued to demand trial although he was represented by counsel. On April 18, 2012, defendant again attempted to file *pro se* motions and demanded his speedy trial motion be heard because over 180 days had passed since he demanded trial. Defendant told the court, "I'm not asking that [counsel] represent me. I can represent myself." The court stated that it was unsure that defendant was capable of representing himself. Defendant stated, "[t]hat may be true. We about to find out."

¶ 8          On May 3, 2012, the court, after giving defendant a chance to consult with his attorneys, asked defendant if he wanted to represent himself. Defendant responded, "I want you to hear my motion. *** If I have to represent myself for you to hear my motion, yes." The court questioned defendant about his ability to represent himself, and defendant stated that he had represented himself before. When the court asked defendant what he wanted to do, defendant said, "I want you to hear my motion." The court responded, "[t]hat means that you're representing yourself." When the court told defendant that going *pro se* would mean no attorney would be helping him, defendant said, "[y]ou can always appoint stand-by counsel." After numerous requests to have defendant articulate whether he wanted to proceed *pro se*, the court stated:

          "Now it is my turn. I will infer from everything that is being said and from everything that [defendant] said before, he wants to be *pro se*. He wants to assert his rights under the Speedy Trial Act. You will be allowed to represent yourself. I don't think it's a good idea, but that is your idea."

¶ 9          The court again explained to defendant that he was wrong that he could assert his right to a speedy trial when represented by counsel. Defense counsel then stated that he found a case that

_____

[2]On October 16, 2009, Kennelly withdrew based on the State Appellate Defender's policy in capital litigation cases. The court then appointed Jack Rimland from the State Appellate Defender to join Richards in representing defendant.

would help explain the concept that "the defendant [is] bound by actions of his attorney unless the defendant clearly asserts his right to discharge." Defendant continued to ask the court to hear his motions, and the court allowed defendant to argue the merits of his motions. The court denied defendant's *pro se* motion to suppress evidence and informed defendant that "if you want them to represent you, I will not hear any other motions from you." Defendant then argued the merits of his speedy trial motion, in which he stated:

> "All these times I was asserting right to speedy trial, you repeatedly each and every court date–repeatedly told me that I had to waive my right to counsel to enforce my right to a speedy trial. Okay. And I repeatedly told you I was not invoking–or waiving my right to counsel, that I want speedy trial."

¶ 10 The court denied the motion because defendant had been represented by counsel who was preparing the case for trial; however, the court noted that defendant was now *pro se* and could demand trial if he wanted. Defendant demanded trial and asked the court for stand-by counsel to assist him in his investigation. The court denied the request, noting that defendant was "trying to be manipulative," but that it would arrange for subpoenas for his witnesses.

¶ 11 On May 10, 2012, the court asked defendant if he "still [wanted] to be *pro se* on this case." Defendant responded, "I never felt that I was representing myself. You know, you told me that you got rid of the lawyer, but since I'm representing myself I'm okay." The court offered to appoint counsel, but informed defendant that he would not be able to file motions or demand trial. Defendant responded, "I'm good. I'm good, Judge." The following exchange occurred:

> "THE COURT: What do you prefer?
>
> DEFENDANT: I'm good. Just like we doing.
>
> THE COURT: You want to represent yourself?
>
> DEFENDANT: I'm good.
>
> THE COURT: So you're waiving your right to a lawyer? You're good with that, that's what you're telling me.
>
> DEFENDANT: You already waived it for me.
>
> THE COURT: No. I didn't waive it for you. I'm trying to–come on. Talk straight to me. I'm just trying to establish and make very clear what your right is. You have a right to a lawyer. If you can't afford one, one will be appointed for you. I have Public Defender's [*sic*] here available to help you and you are welcome to have their services. If you want to not take their services, you don't have to accept the right to a lawyer even though you're entitled to a free lawyer and you can represent yourself. That's your choice.
>
> DEFENDANT: We good. We okay, Your Honor. I'm okay.
>
> THE COURT: I'm going to take that to mean that this is how you want to do it, that you want to represent yourself.
>
> DEFENDANT: I'm good.
>
> THE COURT: Okay. I'm going to accept that as–In fact, he's here by himself and he says he's good with it.
>
> ASSISTANT STATE'S ATTORNEY: Your Honor, the People would respectfully ask that the Court pursuant to Supreme Court Rule 401 further admonish the defendant as to the nature of the charge and the possible penalties.

DEFENDANT: I already know the nature of the charges and I understand Supreme Court Rule 401. It's not necessary.

THE COURT: What's the nature of the charge?

DEFENDANT: The nature of the charge is murder, first degree murder and it carries a natural life sentence. Okay, I understand my rights.

THE COURT: All right. I think we've been having this conversation for a few years, Clarence Trotter and I and I think he does understand."

¶ 12    At an August 24, 2012, status hearing, the State told the court that when they met with defendant earlier in the month to discuss the trial, he stated that he had been forced to go *pro se* and had not actually waived his right to counsel. The court asked defendant if he wanted a lawyer, and defendant stated that he wanted "several things," including the trial file. The court told defendant that he had "all the discovery that you are entitled to by law." The court also told defendant that his trial was scheduled for September 5, 2012, and that he could appoint counsel, but the trial date may change as a result. Defendant stated:

"Now you saying that, okay, I could have a lawyer if *** I don't want to go *pro se*, if I don't want to go to trial on the 5th. But if I want to go to trial on the 5th, I got to go *pro se*, but I got to go *pro se* without proper preparation."

¶ 13    The trial court responded that defendant informed the court that he wanted to go *pro se*, noting that "we've had a long conversation about that" and that it respected his request. The trial court said it would keep the trial date and would only change if defendant wanted a lawyer. Defendant stated that, "All I'm saying is if you make me go *pro se*–" The court interrupted defendant and said, "No, no, no, I'm not making you go *pro se* ***. Don't say I'm forcing you to be *pro se*. That is absolutely not happening." The court then stated that, "If you want a lawyer, you can have a lawyer. Nobody is forcing you to go *pro se*. *** When you had a lawyer, then you're demanding trial. That's being manipulative, and you know that. You're experienced in this." When the court asked defendant if he wanted to "stay *pro se*," defendant responded, "Here we go. I'm not even going to answer." On September 4, 2012, defendant informed the court that he was not ready for trial. His case proceeded to a jury trial on October, 22, 2012. The following evidence was adduced at trial.

¶ 14    During its opening statement, the State explained that in 1981 Marilyn Dods moved to Chicago to live and work at a bank. Her apartment was located at 525 West Arlington. Dods' fiancé, Richard Stevens, followed her to Chicago to "start their lives together." The State further commented, "They met–he was from the West Coast. She was from the East Coast. She moves here, he comes, and they are going to be together."

¶ 15    Christopher Dods, Dods' brother, testified that Dods was a recent graduate of Georgetown University and moved to Chicago to start a new job. He stated that he spoke with his sister every week and that there was no indication that she was having problems in her life. He also stated that she was "extraordinarily excited about her new life and really looked forward to enjoying her career that she worked so hard to create."

¶ 16    Stevens testified that he met Dods in 1979 while studying abroad in Amsterdam. Although they were "chronically underfunded college students," they saw each other as frequently as they could. When Dods got a job in Chicago, he moved there from Portland, Oregon, to be with her. They "spent almost all of [their] time together," but "felt it was appropriate" to maintain separate apartments. The couple spent the evening of September 19, 1981, together. The

following morning, Dods planned to attend church, but Stevens returned to his apartment to organize things. Stevens noted that Dods' faith was "quite deeply held. More so than mine." The two planned to meet after Dods attended church; however, she never arrived. When she did not show, Stevens tried calling her but there was no answer. He then went to her apartment, which had been ransacked. He called her name, but there was no answer. He went to the bathroom and found Dods submerged in the bathtub with "her television on her face." He moved to see if she was alive, but realized she was dead. There was a knife on the bathroom floor.

¶ 17        Chicago police detective Thomas Keane testified that in the late afternoon of September 20, 1981, he and his partner Thomas Sappanos arrived at Dods' apartment. The apartment appeared to be ransacked, and a knife was found on the bathroom floor. Keane later learned that the knife was originally left on the bed but that Stevens, afraid that the perpetrator was still in the apartment, carried the knife to the bathroom with him. Dods was found lying face up in the bathtub, which was filled with water. Her head was submerged, and a small portable television was resting on her abdomen. A blue and white bandana and a sock with a string attached were tied around her neck, which appeared to have been a gag. Dods was wearing a house robe that was down around her back. She was also wearing a bra that was torn between the cups, exposing her breasts. The white slip she was wearing was pulled up around her waist and her lower extremities were exposed. When Dods was removed from the bathtub, Keane observed that her wrists were bound and tied with clothesline.

¶ 18        Dr. Lauren Moser Woertz, an assistant medical examiner for Cook County, testified that she reviewed the original autopsy report on Dods.[3] The report revealed that Dods had been clothed in the same manner as Detective Keane described, and that a brown plastic cord had been wrapped around her wrists four times and tightly knotted. She sustained a recent laceration of the labia minors and a contusion at the rectal/anal junction which were not consistent with consensual sexual intercourse. Dods also sustained a scalp injury consistent with blunt force trauma. Her lungs were filled with water and blood, and frothy foam was coming from her nose and mouth. The autopsy report also noted hemorrhaging to her eyes and "blueing" of her skin that was consistent with strangulation. Dr. Woertz concluded that she agreed with the original medical examiner that the primary cause of death was asphyxia due to drowning.

¶ 19        Marian Caporusso, an expert in forensic microscopy and serology, testified that on September 21, 1981, she received evidence from the case, including vaginal, oral, and rectal swabs of Dods and a pair of men's boxer shorts collected from the living room floor of Dods' apartment. The swab tested positive for semen; however, testing at the time could not identify who left the semen. Caporusso sealed this evidence and preserved it for future analysis.

¶ 20        Mary Margaret Greer-Ritzheimer testified that she performed DNA testing on the swab and semen stains from the shorts in 2000. She identified two full profiles on the swab: Dods' and one unknown male's. She obtained a full male profile from the shorts; the results were "consistent" with the male profile from the swab and did not match Stevens' DNA. She also obtained partial male profiles from other parts of the shorts, which were consistent with the unknown male profile, but not with Stevens'.

---

[3]Dr. Richard Stein, who performed the original autopsy, was deceased at the time of trial.

¶ 21    Debora Depczynski, group supervisor of the Illinois State Police biology DNA section, testified that in September 2005 she became aware of an association between evidence collected in Dods' case and defendant through a computer database which contained DNA samples. She then transferred the association notification form to Detective Stuart Talin at the Chicago police department.

¶ 22    Chicago police detective Robert Clemens testified that he learned of defendant's association with Dods' murder on October 25, 2005. He investigated the case, and on October 14, 2006, obtained a search warrant for a buccal swab from defendant. He performed the swab and sent it to the Illinois State Police crime lab for analysis.

¶ 23    Ryan Paulsen tested defendant's buccal swab, obtained a profile from it, and tested this against the complete profile from the vaginal swab and the shorts. Defendant's DNA profile matched the male DNA profile identified on the vaginal swab. The full male DNA profile taken from the semen found on the boxer shorts also matched defendant. As to the partial DNA profile found on other parts of the shorts, defendant could not be excluded. Although there were different frequencies for the evidence, the male DNA profiles from both the semen stains and the vaginal swabs were consistent with the same donor.

¶ 24    Defendant called his sole witness John Onstwedder, a latent fingerprint expert. Onstwedder testified that he recovered three latent prints in the victim's apartment. The prints did not match defendant's fingerprints or any other individual. He also stated that it was possible for someone to be somewhere without leaving fingerprints.

¶ 25    Both sides then presented closing arguments. The State highlighted that Dods had "just got into the area of Chicago, she came with her fiancé[;] *** they're in a new apartment, they're starting a new life together." In his closing statement, defendant stated that any evidence of sexual intercourse in this case may have been consensual because "jungle fever was running wild" in the early '80s.

¶ 26    In rebuttal, the State responded, "Jungle fever was running rampant? Clarence Trotter, that's the kind of man he is that he's going to mock the brutal rape and murder that he committed against a beautiful young woman who had come to this city to start a new life." He also stated that when Stevens left Dods' apartment, he was "thinking that in a couple of hours his college love, the woman that he was building a new life with her in Chicago, was going to be coming to his apartment to spend the rest of the day together doing the sort of things that he's told you they'd been doing. Fixing up their apartments, enjoying the city, doing the things that people in their early 20s do [when] they're starting out together," but "instead of finding the woman that he was building a new life with, you saw what he found. He found the lifeless body of a beautiful young woman whose life was abruptly ended by this man."

¶ 27    After discussing DNA, the prosecutor said:

    "When Richard Stevens helped Marilyn move into her new home and they started building their life together, little did they realize that the things they were using to build their life together, the ordinary everyday life things were going to be used to end Marilyn's life. That the pieces of clothing that she brought with her to Chicago, that her own bathtub in her home, that her television set were going to be used by him to end that life."

¶ 28    The prosecutor concluded his closing statement with:

"Ladies and gentlemen, you have the power now. He had the power on September 20, 1981 when he caught Marilyn home alone in her apartment. You now have the power. You hold in your hands the sword of justice and it looks an awful lot like this. It's in the shape of a pen, and that's the opinion you're going to use when you go back into that jury room and sign guilty verdict forms holding this defendant responsible for what he did to Marilyn Dods."

¶ 29 The jury convicted defendant of murder. The court asked defendant if he wanted a posttrial attorney, and he said that he did. The court then reappointed Assistant Public Defender White, who filed a motion for a new trial on defendant's behalf. Defendant also filed a *pro se* motion for a new trial, in which he alleged ineffective assistance of counsel because "trial counsel failed to protect the defendant's right to assistance of counsel," although he "never indicated in any way that he did not want counsel's representation." White sought to withdraw based on defendant's allegation of ineffective assistance of counsel. The court denied counsel's request to withdraw but allowed consideration of defendant's *pro se* claims in the form of a *Krankel* hearing. During the hearing, defendant said he had never waived his right to counsel. The court denied defendant's motion and disagreed that he had never asked to represent himself. Following a hearing in aggravation and mitigation, the court then sentenced defendant to life in prison, noting that this was his second murder conviction.

¶ 30                                        ANALYSIS
¶ 31                             Waiver of Right to Counsel

¶ 32 We first address defendant's contention that the trial court erred in finding that defendant waived his right to counsel where any waiver was neither unequivocal nor voluntary in light of defendant's conflicting statements and accusations that the court had forced him to proceed *pro se*. The State responds that the record in this case reveals that defendant made a knowing and voluntary waiver of his right to counsel.

¶ 33 The right to counsel is a fundamental right, guaranteed by both the United States and Illinois Constitutions. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. A defendant also has the right to proceed without counsel when he voluntarily and intelligently elects to do so. *People v. Baker*, 92 Ill. 2d 85, 90 (1982) (citing *Faretta v. California*, 422 U.S. 806 (1975)). It is "well settled" that waiver of counsel must be clear and unequivocal, not ambiguous. *People v. Baez*, 241 Ill. 2d 44, 116 (2011) (citing *People v. Burton*, 184 Ill. 2d 1, 21 (1998)). In determining whether a defendant's statement is clear and unequivocal, a court must determine whether the defendant truly desires to represent himself and has definitively invoked his right of self-representation. *Id.* We must indulge every reasonable presumption against waiver of the right to counsel. *Id.* (citing *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). "The purpose of requiring that a defendant make an unequivocal request to waive counsel is to prevent him from (1) appealing the denial of his right to self-representation or the denial of his right to counsel, and specifically (2) manipulating or abusing the criminal justice system by vacillating between requesting counsel and requesting to proceed *pro se*." *People v. Gray*, 2013 IL App (1st) 101064, ¶ 23. The determination of whether there has been an intelligent waiver of the right to counsel depends upon the particular facts and circumstances of the case, including the conduct of the defendant, his background, and his experience. *Id.* We review the trial court's determination for abuse of discretion. *Id.*

¶ 34    In this case, we cannot conclude that the trial court abused its discretion. The conduct of defendant during pretrial proceedings clearly indicates that defendant unequivocally and voluntarily waived his right to counsel. Although defendant was represented by counsel for the majority of his pretrial proceedings, the record reveals that defendant submitted a number of both oral and written *pro se* motions demanding, *inter alia*, a speedy trial. In response, the court patiently and repeatedly informed defendant that he was not allowed to file *pro se* motions when represented by counsel; in fact, the court specifically told defendant that he could only hear from "one voice," either him or his counsel, but not both. At that time, defendant continued to proceed with counsel.

¶ 35    After attempting to submit *pro se* motions to the court once again on April 18, 2012, defendant informed the court "I'm not asking that [counsel] represent me. I can represent myself." The court gave defendant time to consult with his attorney, and on May 3, 2012, the court asked defendant if he wanted to represent himself, to which defendant responded, "I want you to hear my motion. *** If I have to represent myself for you to hear my motion, yes." The court then attempted to determine whether defendant could represent himself by asking him questions about his past experience, and defendant responded that he has represented himself in prior litigation. The court again asked defendant if he wanted to proceed *pro se*, and defendant replied, "I want you to hear my motion." The court responded, "That means you're representing yourself." After repeatedly attempting to elicit a direct response from defendant regarding whether he wanted to proceed *pro se*, the court stated:

> "Now it is my turn. I will infer from everything that is being said and from everything that [defendant] said before, he wants to be *pro se*. He wants to assert his rights under the Speedy Trial Act. You will be allowed to represent yourself. I don't think it's a good idea, but that is your idea."

Finding a valid waiver, the court then allowed defendant to argue the merits of his motions, which the court promptly denied.

¶ 36    On May 10, 2012, the court asked defendant if he still wanted to proceed *pro se*, and defendant stated that, "I never felt that I was representing myself. *** I'm okay." The court again offered to appoint an attorney to defendant, to which he replied, "I'm good," before accusing the court of waiving his right to counsel for him. When the assistant State's Attorney asked the court to admonish defendant pursuant to Illinois Supreme Court Rule 401 (eff. July 1, 1984), defendant confirmed that he knew the nature of the charges, which he recited before the court, and that he understood his rights.

¶ 37    We find that the above conversations clearly illustrate that defendant "definitively invoked his right of self-representation." *Baez*, 241 Ill. 2d at 116. Although defendant alleges that his statements regarding self-representation were "contradictory and ambiguous," it is clear from the record that the court repeatedly informed defendant that it would not hear his *pro se* motions while he was represented by counsel. In response, defendant stated that he waived his right to counsel if it meant the court would hear his motions. Because a defendant has either the right to counsel or the right to represent himself, and is thus not entitled to "hybrid representation, whereby he would receive the services of counsel and still be permitted to file *pro se* motions" (*People v. Handy*, 278 Ill. App. 3d 829, 836 (1996)), the trial court did not abuse its discretion in finding that defendant waived his right to counsel. Further, it is abundantly clear that defendant, who admitted that he had represented himself on previous cases and informed the court that he "do[es] law," was well acquainted with his right to

counsel pursuant to Illinois Supreme Court Rule 401, as he accurately and articulately recited the nature of the charges against him and his potential penalty. See *People v. Johnson*, 119 Ill. 2d 119, 133 (1987) (finding a valid waiver of counsel where the defendant was "no stranger to criminal proceedings"). Thus, we find that the trial court did not abuse its discretion in finding that defendant executed a valid waiver of counsel.

¶ 38        Nonetheless, defendant cites *People v. Burton*, 184 Ill. 2d 1 (1998), and *People v. Brooks*, 75 Ill. App. 3d 109 (1979), to advance the proposition that defendant's statements were not clear and unequivocal statements necessary to effectuate a waiver of counsel. We find both cases unavailing. In *Burton*, our supreme court held that the defendant's request to proceed *pro se* at the sentencing stage was not unequivocal where his statement that he would be willing to proceed *pro se* to gain certain access to counsel's record indicated only a "conditional willingness" to represent himself. *Burton*, 184 Ill. 2d at 25. Similarly, in *Brooks*, this court found that the defendant's single statement during his preliminary hearing that he did not need counsel " 'at this present time' " was not an unequivocal demand to represent himself, but a tool to avoid a continuance. *Brooks*, 75 Ill. App. 3d at 110. In the instant case, defendant contends that his statements to the court show any finding of a valid waiver "would be against his wishes and only because it was necessary to preserve his rights." However, the trial court repeatedly asked defendant if he wanted to continue to represent himself even after hearing his *pro se* motions. Defendant responded that he never felt that he was representing himself, yet when the court offered to appoint him counsel, defendant stated, "I'm good." Thus, we cannot say that defendant's waiver of counsel amounted to an incomplete or ambiguous waiver of counsel as in *Brooks* and *Burton*.

¶ 39                                    Prosecutorial Misconduct

¶ 40        Next, defendant contends that the prosecutors in this case improperly inflamed the passions of the jury by eliciting extensive and irrelevant testimony about Dods and her fiancé, previewing this testimony in opening statement, and relying on it in closing argument. The State responds that defendant forfeited review of this issue when he failed to object to the prosecutors' comments at trial and raise the matter in a posttrial motion; nonetheless, it argues that the testimony about the victim and the prosecutors' comments during opening statement and closing argument did not constitute plain error.

¶ 41        Defendant acknowledges that he forfeited review of this claim, but requests this court to consider the issue under the closely balanced prong of the plain error analysis. However, before we can determine whether the plain error doctrine applies in this case, we must first determine whether an error actually occurred. *People v. Jackson*, 2012 IL App (1st) 092833, ¶ 34.

¶ 42        First, defendant contends that the State engaged in "prejudicial misconduct" during its opening statement when the prosecutor previewed irrelevant testimony that Dods and Stevens moved to Chicago to "start their lives together," and when it explained that "[t]hey met–he was from the West Coast. She was from the East Coast. She moves here, he comes, and they are going to be together." We disagree.

¶ 43        Our supreme court has noted that an opening statement may include a discussion of the evidence and matters that may reasonably be inferred from the evidence. *People v. Smith*, 141 Ill. 2d 40, 63 (1990). An improper remark during opening statement will be grounds for reversal only if the remark "resulted in substantial prejudice to the defendant" in that it was a

- 10 -

material factor in the conviction or the jury might have reached a different verdict had the prosecutor not made the remark. *People v. Flax*, 255 Ill. App. 3d 103, 109 (1993). Moreover, absent deliberate misconduct, incidental and uncalculated remarks in opening statement cannot form the basis of reversal. *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993). The determination as to the propriety of a prosecutor's remarks during opening statement is within the trial judge's discretion, and every reasonable presumption must be applied that the trial judge properly exercised such discretion. *Flax*, 255 Ill. App. 3d at 108-09.

¶ 44     We do not find that the prosecutor's comments during opening statement were improper. A review of the State's opening statement reveals that the prosecutor was merely previewing the facts surrounding Dods' life at the time of her death; which were relayed as Stevens testified regarding the circumstances leading to the discovery of Dods' murder. "Common sense dictates that a victim does not live in a vacuum [citations], and evidence of a victim's *** relations is admissible to the extent necessary to properly present the prosecution's case [citation]." *Cloutier*, 156 Ill. 2d at 508. Accordingly, we believe that the prosecutor's incidental comments during opening statement regarding Dods' relationship with Stevens were reasonable, as they served to introduce his testimony and did not amount to deliberate misconduct to inject irrelevant and prejudicial matters into the trial. *Id.*

¶ 45     Next, defendant contends that the State offered irrelevant background information when it elicited testimony from Stevens and Christopher Dods, which "created a vivid picture" of Dods' life.

¶ 46     Evidence is relevant "where the fact or circumstance offered tends to prove or disprove a disputed fact or to render the matter at issue more or less probable." *People v. Hall*, 192 Ill. App. 3d 819, 823-24 (1989). Any circumstances which tend to make the proposition at issue more or less probable may be put into evidence. *Id.* at 823. Relevance can also be established by means of inference. *People v. Jones*, 108 Ill. App. 3d 880, 884-85 (1982). The determination of whether evidence is relevant rests in the discretion of the trial court. *Hall*, 192 Ill. App. 3d at 824.

¶ 47     Although defendant argues that the only purpose that this "irrelevant" testimony could serve was to "prejudice the defendant in the eyes of the jury and arouse in them anger, hate and passion," we find that the testimony elicited by the prosecutor from Stevens and Christopher Dods was relevant in the instant case. The testimony of both men provided background for the events preceding Dods' murder. Christopher testified that his sister had just graduated from college and moved to Chicago to start a new job, noting that he communicated with her frequently. This testimony established that there was nothing to foreshadow Dods' murder, as he believed she was excited about her new life in Chicago. Stevens testified that although Dods lived alone, they spent almost all of their time together and that the two planned to meet after she attended church, noting that Dods' faith was "quite deeply held." This testimony provided a chain of events and explained why he left her apartment the morning she was murdered, but called her repeatedly when she had not answered her phone before returning to her apartment to look for her. Additionally, a review of Stevens' comment regarding Dods' faith in context reveals an attempt to explain why he elected to return to his apartment the morning of Dods' murder in lieu of attending church services with her. Thus, the testimony defendant complains of here does not approach the clearly inflammatory testimony elicited in the cases he relies upon to support his argument. See *People v. Hope*, 116 Ill. 2d 265, 276-78 (1986) (finding repeated references to victim's wife and small children improper); see *People v. Blue*, 189 Ill.

2d 99, 131 (2000) (testimony concerning age of victim's child, fact that family had lived in same building together, and length of time victim's father had been married served no other purpose than to inflame jury). Instead, we believe that the details provided in both testimonies were relevant to the presentation of the State's case.

¶ 48    Finally, defendant contends that the prosecutorial misconduct continued in the State's closing argument and rebuttal. Specifically, he contends that the prosecutor improperly emphasized the "new life" Dods and Stevens were starting together.

¶ 49    Initially, we note that the parties disagree about the proper standard of review in regard to remarks made during closing argument. A review of the case law reveals a conflict among Illinois Supreme Court cases. In both *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007), and *People v. Sims*, 192 Ill. 2d 592, 615 (2000), our supreme court suggests that we review this issue *de novo*, because the prosecutor's statements are reflected in the transcripts and are therefore undisputed, leaving only a legal question. Conversely, in *People v. Hudson*, 157 Ill. 2d 401, 441 (1993), our supreme court suggests that the trial court is in a better position to rule on objections during closing argument, and the standard is therefore abuse of discretion. We need not take a position in this case, as defendant's claim fails under either standard. See *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008) ("[W]e do not need to resolve the issue of the appropriate standard of review at this time, because our holding in this case would be the same under either standard.").

¶ 50    It is well established that prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant. *People v. Kitchen*, 159 Ill. 2d 1, 38 (1994) (citing *People v. Pittman*, 93 Ill. 2d 169, 176 (1982)). During closing argument, the prosecutor may properly comment on the evidence presented or reasonable inferences drawn from that evidence, respond to comments made by defense counsel which clearly invite response, and comment on the credibility of witnesses. *People v. Rader*, 178 Ill. App. 3d 453, 466 (1988). In reviewing whether comments made during closing argument are proper, the closing argument must be viewed in its entirety, and remarks must be viewed in context. *Kitchen*, 159 Ill. 2d at 38.

¶ 51    In this case, we do not find that the prosecutor engaged in misconduct during closing argument when he noted that Dods had just moved to Chicago to start a life with her fiancé. Based on our review of the record, we find that the prosecutor merely commented on evidence properly presented at trial regarding Dods' background and the relevant details of her life prior to her murder. It is abundantly clear from the record that Dods' intention in moving to Chicago was to start a new job and build a life with her fiancé, who had recently moved from Portland to be with her. We do not find that it was improper for the State to reference this fact in its closing argument. See *Rader*, 178 Ill. App. 3d at 466.

¶ 52    Furthermore, we find that the prosecutor's comments in rebuttal were not improper. After defendant concluded his closing argument with the statement that any sexual acts in this case may have been consensual as "jungle fever was running wild" in the early 1980s, the State responded that defendant was mocking the rape and murder of "a beautiful young woman who had come to this city to start a new life." We find that defendant's ludicrous statement invited a response where the medical examiner testified that Dods' autopsy indicated clear signs of forcible intercourse. See *People v. Starnes*, 374 Ill. App. 3d 132, 136 (2007).

¶ 53    Additionally, we do not find the State's comments that Stevens left Dods' apartment "thinking that *** [he would] spend the rest of the day [with her] doing the sort of things that

- 12 -

he's told you they'd been doing" but "instead of finding the woman he was building a new life with *** found the lifeless body of a beautiful young woman whose life was abruptly ended by [defendant]" were improper. These comments were a reasonable inference of the evidence presented in this case, which showed that Stevens, who spent almost all his time with Dods, intended to meet with her after she attended church, but instead found his fiancée dead in her apartment. *Rader*, 178 Ill. App. 3d at 466. Further, the State's comment that "little did they realize that the things they were using to build a life together *** were going to be used to end Marilyn's life" was also a reasonable interference based on the condition in which Stevens testified that he found Dods; she was murdered in her own apartment, submerged in her own bathtub with her television on her body. *Id.*

¶ 54     Also, we do not find that it was improper for the State to conclude its closing argument with comments to the jury that "you now have the power" and that the jurors "hold in [their] hands the sword of justice," urging them to sign a guilty verdict form "holding this defendant responsible for what he did to Marilyn Dods." We acknowledge our supreme court's holdings that prosecutors have wide latitude in closing argument (*Kitchen*, 159 Ill. 2d at 38) and may properly comment unfavorably on the defendant, the violence of the crime, and the benefits of the fearless administration of the law. *Hope*, 116 Ill. 2d at 277-78 (citing *People v. Jackson*, 84 Ill. 2d 350, 360 (1981)).

¶ 55     Nonetheless, defendant relies on *People v. Littlejohn*, 144 Ill. App. 3d 813 (1986), and *Hope*, 116 Ill. 2d 265, to argue that the prosecutor's improper statements in this case necessitate a new trial. We find this reliance misplaced. In *Littlejohn*, this court found that that prosecutor's comments during closing argument regarding events that the infant victim would never experience, such as her first day of school, were made solely to distract the jury from the real issues of the case. *Littlejohn*, 144 Ill. App. 3d at 827. In *Hope*, the court found that the prosecutor's comments regarding the victim's family and the elicited testimony from the victim's spouse regarding their children and her identification of family photos were not "brought to the jury's attention *incidentally*, rather it was presented in a series of statements and questions in such a method as to permit the jury to believe it material." (Emphasis in original.) *Hope*, 116 Ill. 2d at 270, 278. Unlike the comments in *Littlejohn* and *Hope*, the State's remarks here served a useful purpose in presenting its case, and were not simply used to appeal to the juror's sympathy and emotions.

¶ 56     As a final note, even if we found that the State's comments were improper, we acknowledge that immediately preceding closing arguments, the trial court cautioned the jury that, "Closing arguments are not evidence. It is a chance for the lawyers and the parties to have to explain to you why you ought to return the particular verdict that they'll ask you to return in this case." Additionally, at the close of arguments, the court issued jury instructions which stated that "neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded." Thus, we cannot say that these remarks affected the outcome of the defendant's trial, as the court provided sufficient instructions to preempt consideration of potentially improper comments as evidence. See *People v. Taylor*, 166 Ill. 2d 414, 438 (1995) ("The jury is presumed to follow the instructions that the court gives it.").

¶ 57                                    CONCLUSION

¶ 58          For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 59          Affirmed.