NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241492-U

NOS. 4-24-1492, 4-24-1493 cons.

IN THE APPELLATE COURT

FILED
March 12, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Stephenson County |
| RONALD E. BURT, | ) | Nos. 92CF49 |
|     Defendant-Appellant. | ) |     92CF50 |
| | ) | |
| | ) | Honorable |
| | ) | Kevin J. Ward, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Doherty and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, finding the trial court did not err in granting the
State's motion to dismiss defendant's amended postconviction petition.

¶ 2    Defendant, Robert E. Burt, appeals the trial court's dismissal of his amended
postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1
*et seq.* (West 2024)). On October 18, 2024, the court granted the State's motion to dismiss
defendant's amended postconviction petition. In its written ruling, the court found (1) defendant
forfeited his claims related to the manner in which the court conducted *voir dire* by failing to raise
them on direct appeal and (2) defendant failed to make a substantial showing of a constitutional
violation with respect to his claim trial counsel was ineffective for not adequately presenting
defendant's motion for change of venue. On appeal, defendant argues the court erred in dismissing
his amended petition because "[t]he trial court and defense counsel deprived [him] of a fair jury

trial by failing to question potential jurors about the substance of their knowledge about [his] case learned from local media reports." We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        At the outset, we note this case comes before this court following two prior remands from the Second District. *People v. Burt*, No. 2-18-0821 (2021) (unpublished summary order pursuant to Illinois Supreme Court Rule 23(c)), and *People v. Burt*, 2016 IL App (2d) 131078-U. Therefore, we include only those facts necessary to understand defendant's argument on appeal. For a more detailed recitation of the factual background, see *Burt*, 2016 IL App (2d) 131078-U.

¶ 5        On February 5, 1992, the State charged defendant with eight counts of first degree murder (Ill. Rev. Stat. 1991, ch. 38, ¶ 9-1(a)(1), (2), (3)) related to the shooting deaths of H. Steven Roy and Kevin Muto, which occurred on January 16, 1992. Defendant was also charged with two counts of armed robbery (Ill. Rev. Stat. 1991, ch. 38, ¶ 18-2) and a multitude of other theft-related offenses stemming from the same incident.

¶ 6        The case proceeded to a jury trial in March 1993. Prior to trial, the State indicated it would proceed solely on six counts of first degree murder (three alternate theories per victim) and two counts of armed robbery; all other charges were dismissed. On the fourth day of defendant's jury trial, before the State had rested its case, defendant indicated he wished to plead guilty. Defendant acknowledged he would be pleading guilty without any agreement from the State and against the advice of his attorneys. After a brief colloquy with the trial court, defendant pled guilty to two counts of first degree murder and two counts of armed robbery. Following a bifurcated sentencing hearing, defendant was sentenced to death. After defendant's trial, his two codefendants, Daniel Booth and David Craig, both pled guilty to one count of first degree murder. Booth was sentenced to 40 years' imprisonment, and Craig was sentenced to 28 years'

imprisonment.

¶ 7       Defendant filed a direct appeal alleging (1) the trial court's admonishments prior to his guilty plea were defective, (2) he was entitled to a new sentencing hearing, and (3) the death penalty was unconstitutional. *People v. Burt*, 168 Ill. 2d 49, 61, 70, 81 (1995). The Illinois Supreme Court rejected defendant's arguments and affirmed his convictions and sentence. *Id.* at 82. Defendant then filed a *pro se* postconviction petition, which was later amended by appointed counsel, alleging due process violations and ineffective assistance of counsel. The trial court granted the State's motion to dismiss defendant's petition and the Illinois Supreme Court affirmed. See *People v. Burt*, 205 Ill. 2d 28, 48 (2001).

¶ 8       In January 2003, Governor George Ryan commuted defendant's death sentence to life imprisonment. Defendant then petitioned for a writ of *habeas corpus* (28 U.S.C. § 2254 (2000)), asserting he was denied due process and received ineffective assistance of counsel. The district court denied defendant's petition. However, in September 2005, the Seventh Circuit Court of Appeals granted defendant's petition, finding, "The trial court never should have accepted [defendant's] guilty plea without first ordering a renewed competency hearing, and the Illinois Supreme Court unreasonably applied clearly established federal law when it found that [defendant] was not denied due process." *Burt v. Uchtman*, 422 F.3d 557, 566 (2005).

¶ 9       Following the Seventh Circuit's decision, the State indicated it intended to retry defendant. In November 2005, the trial court *sua sponte* appointed Dr. Terrance Lichtenwald to examine defendant and determine whether defendant was fit to stand trial. On March 30, 2006, the parties informed the court that Dr. Litchenwald had examined defendant and found him fit to stand trial. Based on the parties' stipulation and its review of Dr. Litchenwald's report, the court found there was no *bona fide* doubt as to defendant's fitness to stand trial.

¶ 10    On August 31, 2006, defense counsel filed a motion for change of venue, alleging defendant could not receive a fair trial in Stephenson County because (1) there had been adverse pretrial publicity and (2) key individuals involved in defendant's first trial now held prominent positions in Stephenson County's judicial system. Defense counsel attached a three-page article from the *Journal Standard* dated May 7, 2006, to the motion. According to the article, defendant was set to be retried for the " 'execution style' " double-murder of Roy and Muto after the Seventh Circuit Court of Appeals determined the State would either need to retry defendant or release him. The article stated defendant was previously sentenced to death row "[a]fter inexplicably pleading guilty in the middle of his trial." It then noted Craig, one of the codefendants, was recently released from prison and the other codefendant, Booth, would be eligible for parole in five years. The article also set forth a portion of the rationale from the Seventh Circuit's decision overturning defendant's conviction and concluded with a brief overview of Burt's statements to police regarding the shootings.

¶ 11    The trial court held a hearing on defense counsel's motion for change of venue in October 2006. At the hearing, defense counsel noted, "[T]his is a case that back when it was originally tried was a sensational case for Stephenson County. I have been unable to obtain copies of the press clippings but have been informed that there were many and the press followed this case very closely." Defense counsel then noted multiple attorneys involved in defendant's original trial were now judges and defendant's former attorney was currently the state's attorney for Stephenson County. In response, the State acknowledged the case had significant pretrial publicity prior to defendant's initial trial. However, the State asserted the parties had been able to select a "fair and impartial jury in approximately one week's time" prior to defendant's initial trial, even with the pretrial publicity. Additionally, the State contended there was less pretrial publicity

- 4 -

surrounding defendant's retrial and noted the article attached to defense counsel's motion was six months old and simply recapped the procedural history of the case. The court denied defense counsel's motion but indicated if there were problems selecting a jury, defense counsel could renew his motion.

¶ 12　　　　Jury selection began for defendant's retrial on December 4, 2006. During *voir dire*, the following exchange occurred between the trial court and one of the prospective jurors:

> "THE COURT: Can you follow the law as the Court gives it to you even if you didn't personally agree with it?
>
> JUROR MEINDERS: I can't honestly say that I can be fair in this. I just— in this case, I don't know. I guess it's just hard for me to under—be fair to the Defendant. I mean he—it was in the paper that he pleaded guilty.
>
> THE COURT: All right. And of course, what you read in the paper isn't necessarily—
>
> JUROR MEINDERS: I know you're not supposed—but it's still—
>
> THE COURT: All right. If that would be in your mind and then—
>
> JUROR MEINDERS: Yes.
>
> THE COURT: —that prevents you from presuming innocence in this case, then I'm going to excuse you."

Following this exchange, the parties had an off-the-record discussion with the court. The court then dismissed the entire jury pool, stating,

> "[T]here has been some publicity in this case, and as a result of that we're going to dismiss all of you from having to serve on this panel, and we'll be addressing this with a new panel tomorrow because of some of the statements that have been made

- 5 -

here, so we're gonna adjourn, and you are free to go."

After the jury pool was dismissed, the court advised the parties it would be conducting *voir dire* in panels of four going forward to prevent any potential tainting of the entire jury pool. Defense counsel did not object to this procedure.

¶ 13      The next day, prior to beginning *voir dire*, the trial court gave the following admonition to the jury pool:

>      "Now, this is a case that has received a substantial amount of publicity in the newspapers, the radio, and television, and if you're aware of any of this, of this publicity, that doesn't mean by itself that you're disqualified, *** however, if that publicity's caused you to form any opinions about the case already and you think you might not be able to put those opinions aside entirely and listen to the evidence of the case with an open mind, please be candid about it when I ask you questions about the case when we get into the courtroom."

Following this admonition, the parties proceeded to *voir dire* and examined prospective jurors in panels of four.

¶ 14      During the trial court's examination of each panel, the court made the following inquiry of each prospective juror: "Have you heard anything—without getting into it, but have you heard anything about this case before today?" If the prospective juror answered affirmatively, the court asked what the source of information was and whether the prospective juror felt they could still be fair and impartial in light of what they had heard. We note the court did not specifically ask any potential juror about the content from that source, meaning specifically what the potential juror had heard or read. The State and defense counsel were given the opportunity to question prospective jurors following the court's initial inquiry. Defense counsel specifically inquired about

pretrial publicity on multiple occasions, asking questions such as: (1) "[Y]ou had indicated *** that you had read something in the paper but believed you could put that aside. Can you elaborate on that without getting into the details?"; (2) "Do you think you're gonna be able to [be fair and impartial] in this case based on what you've seen and heard?"; and (3) "[W]ithout telling me what you've heard, do you think you can just put that past you basically and make a decision on what you hear in this court?"

¶ 15          The following is a summary of the prospective jurors, their prior knowledge of the case, and whether they were selected as a juror. (We note the prospective jurors are listed in the order in which they were examined during *voir dire*.) Juror Maher had not heard anything about the case but was excused by the trial court for reasons unrelated to pretrial publicity. Juror Ferguson read about the case in the newspaper but asserted he could set aside his prior knowledge. He was excused by the court for reasons unrelated to pretrial publicity. Juror Mulder heard about the case through the newspaper and radio but felt she could put aside her prior knowledge; she was selected as a juror. Juror Grunder heard about the case through the newspaper and radio and was excused by the court because he stated he could not put aside his prior knowledge. Juror Mulder heard about the case through the newspaper, radio, and television but stated he could put aside his prior knowledge. He was excused by the court for reasons unrelated to pretrial publicity. Juror Ditsworth read about the case in the newspaper but stated he could put aside his prior knowledge. He was excused by the court for reasons unrelated to pretrial publicity. Juror Mathews had not heard anything about the case and was selected as a juror. Juror Guentner heard about the case through the newspaper and television but stated she could put her prior knowledge aside. She was removed by defendant via peremptory challenge. Juror Mullarkey had not heard anything about the case and was selected as a juror. Juror Cole had not heard anything about the case and was

selected as a juror. The first four potential jurors selected to serve on the jury were Bollon, Mullarkey, Mathews, and Cole.

¶ 16 Prior to the trial court swearing in the four selected jurors, defense counsel renewed his motion for a change of venue. In support of his renewed motion, defense counsel asserted "five of the seven potential jurors had indicated that they had either read an account of the case in the paper or seen it on [television] or heard it on the radio." Counsel also provided the court with copies of newspaper articles from December 3 and December 5, 2006. (A review of the record demonstrates there were no newspaper articles filed at or near the time defense counsel renewed his motion for change of venue. However, there were articles with these dates attached to defendant's second amended postconviction petition.) Defense counsel stated,

"I have a copy of today's article, the article in the paper today, in where the third paragraph says, '[Defendant], who abruptly pleaded guilty in the middle of the first trial, later won commutation of his death sentence in 2003 from Governor George Ryan.'

Like I said at that point at least five of the seven potential jurors had indicated that they had seen an article, and my Motion was renewed in regards to the change of venue."

The court denied defense counsel's renewed motion and swore in the four selected jurors.

¶ 17 The trial court then proceeded to examine the next prospective jurors. Juror Brubaker had not heard anything about the case. He was removed by defendant via peremptory challenge. Juror Gahm had not heard anything about the case and was selected as a juror. Juror Folgate was excused by the court for reasons unrelated to pretrial publicity. Juror Kappes heard about the case through the newspaper and television and was excused by the court after she said it

would be difficult for her to be fair and impartial based on her prior knowledge. Juror Schuler had not heard anything about the case. She was removed by the State via peremptory challenge. Juror Gallagher heard about the case through the newspaper and television. At first, she indicated she could put aside her prior knowledge. However, she later hesitated and seemed to suggest defendant would need to prove his innocence. The court clarified the issue with her and appeared satisfied with her response, as the court did not excuse her for cause. Eventually, Juror Gallagher was removed by defendant via peremptory challenge. Juror Davis explained she remembered when the case was in the newspaper at the time of defendant's initial trial but felt she could put aside her prior knowledge. She was excused by the court for reasons unrelated to pretrial publicity. Juror Scheider had not heard anything about the case and was selected as a juror. Juror Rasner stated her husband told her what the case was about after he read an article online, but she felt she could put that information aside. She was selected as a juror. Juror Ethridge read an article in the newspaper about the case but felt she could put that information aside. She was selected as a juror. The court then swore in Gahm, Scheider, Rasner, and Ethridge.

¶ 18        The parties then proceeded to examine additional prospective jurors. Jurors Brierre and Rees were excused by the trial court for reasons unrelated to pretrial publicity. Juror Bendick had not heard anything about the case and was selected as a juror. Juror Soltysik was excused by the court for reasons unrelated to pretrial publicity. Juror Eilers read an article in the newspaper about the case but felt she could be fair and impartial. She was removed by defendant via peremptory challenge. Juror Metz heard about the case on the radio at the time of defendant's initial trial and read a recent newspaper article but felt he could be fair and impartial. He was excused by the court for reasons unrelated to pretrial publicity. Juror Ruthe read about the case during defendant's initial trial and was excused by the court after she stated she thought defendant

was guilty. Juror Sterns saw a newspaper article about the case on the morning of jury selection but felt he could be fair and impartial. He was selected as a juror. Juror Eytcheson read recent newspaper articles, which jogged his memory about defendant's initial trial, but he asserted he could be fair and impartial. He was selected as a juror. Jurors Carlson and Dix read newspaper articles about the case and were excused after they indicated they could not put aside their prior knowledge of the case. Juror Schnierla read the recent newspaper article about the case but stated she felt she could put her knowledge aside. She was excused by the court because she stated she did not believe defendant had the presumption of innocence. Juror Lingenfelter read about the case in the newspaper and was excused by the court after he said he felt it would be difficult to put aside his prior knowledge. Juror Wolfe stated she heard about the case through someone at work but could disregard what she heard. She was removed by defendant via peremptory challenge. Juror Kurtz had not heard anything about the case and was selected as a juror. The court then swore in Bendick, Sterns, Eytcheson, and Kurtz.

¶ 19       After swearing in the final four jurors, the trial court examined additional prospective jurors for the purpose of selecting alternate jurors. Juror Simpson had not heard anything about the case and was selected as an alternate juror. Juror Felder read about the case in the local newspaper but could put aside his prior knowledge. He was selected as an alternate juror. Defense counsel did not raise any peremptory or cause challenges to the alternate jurors.

¶ 20       Of the 12 jurors empaneled to hear defendant's case, 7 had no prior knowledge of the case and 5 (Jurors Bollon, Rasner, Ethridge, Sterns, and Eytcheson) had heard about the case through either the newspaper, television, radio, or word of mouth but asserted they could put aside their prior knowledge and determine defendant's guilt or innocence based solely on the evidence presented at trial. Defense counsel did not raise any challenges for cause related to the 12 jurors

empaneled to hear the case. Further, defense counsel only utilized five of his seven peremptory challenges. See Illinois Supreme Court Rule 434(d) (eff. May 1, 1985) ("A defendant tried alone shall be allowed seven peremptory challenges in a case in which the punishment may be imprisonment in the penitentiary.")

¶ 21    The case proceeded to trial, and after three days of testimony, the jury found defendant guilty of two counts of first degree murder and two counts of armed robbery. Defense counsel filed a motion for a new trial, alleging, *inter alia*, the trial court erred in denying the motion to change venue. The court denied the motion and sentenced defendant to life imprisonment on the first degree murder convictions and 10 years' imprisonment on the armed robbery convictions.

¶ 22    Defendant filed a direct appeal, contending (1) the trial court erred in denying his second motion to suppress evidence and (2) the court abused its discretion in denying his motion for a change of venue. In August 2009, the Second District affirmed defendant's convictions and sentence. See *People v. Burt*, No. 2-07-0635 (2009) (unpublished order).

¶ 23    On May 27, 2010, defendant filed a *pro se* postconviction petition. The trial court advanced defendant's petition to second-stage proceedings and appointed counsel, Douglas Clymer, to represent defendant. Clymer subsequently filed a first amended petition on April 24, 2012. In January 2013, the State filed a motion to dismiss defendant's first amended petition, which the court granted. Defendant appealed the dismissal of his first amended petition, and the Second District reversed, finding postconviction counsel provided unreasonable assistance by failing to attach "affidavits or other exhibits to support the claim that trial counsel was ineffective for failing to support sufficiently [defendant's] motion for change of venue." *Burt*, 2016 IL App (2d) 131078-U, ¶¶ 45, 51.

¶ 24    After the Second District's decision, defendant filed a *pro se* amended

postconviction petition on July 25, 2016. In February 2018, the trial court reappointed counsel for defendant. Postconviction counsel, Travis Lutz, then filed a second amended postconviction petition on June 5, 2018. The second amended petition alleged trial counsel was ineffective for failing to (1) present sufficient evidence to substantiate the motion for change of venue, (2) utilize all his peremptory strikes to remove jurors with pretrial knowledge of defendant's case, (3) request the court excuse jurors for cause based on their pretrial knowledge of defendant's case, and (4) present sufficient evidence to support the motion for a new trial based on the court's denial of the motion for change of venue. Numerous newspaper articles published around the time of defendant's initial trial and retrial were attached as exhibits to the second amended petition. Of the attached articles, 2 were published in 1992, 16 were published in 1993, 1 was published in 1998, 8 were published in 2006, and 1 was published in 2007. The dates of the articles published in 2006 are as follows: May 7, 2006; December 3, 2006; December 5, 2006; December 6, 2006; December 7, 2006; December 8, 2006; December 9, 2006; and December 12, 2006.

¶ 25        On August 13, 2018, the State filed a motion to dismiss defendant's second amended petition, which the trial court granted. Defendant then appealed the dismissal of his second amended postconviction petition, and the Second District reversed, finding postconviction counsel again provided unreasonable assistance by failing to "investigate television or radio broadcasts" related to defendant's claim trial counsel was ineffective for failing to sufficiently support defendant's motion for change of venue. *Burt*, No. 2-18-0821 (2021) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 26        On remand, the trial court appointed postconviction counsel, Andrew Hanson, to represent defendant. In January 2023, Hanson filed a supplement to the second amended postconviction petition filed by Lutz in June 2018. (For clarity, we will refer to Hanson's

supplement as the "supplemental petition.") We would be remiss if we did not note the incredibly lengthy and unexplained delay between remand and the filing of the supplement. The supplemental petition adopted the entirety of the June 2018 second amended postconviction petition and added an additional allegation that trial counsel was ineffective for failing to present any evidence regarding television or radio broadcasts aired at the time of defendant's retrial in support of the motion for change of venue. A report from a private investigator was attached as an exhibit to the supplemental petition. The report detailed the information the investigator was able to locate regarding television and radio broadcasts aired at the time of defendant's retrial.

¶ 27        The State filed a motion to dismiss the supplemental petition, contending (1) defendant forfeited his claims regarding trial counsel's performance during jury selection by failing to raise them on direct appeal, or alternatively, defendant failed to prove trial counsel's performance during jury selection was deficient; (2) defendant failed to prove trial counsel performed deficiently when arguing the motion for a change of venue; and, in the alternative, (3) all defendant's claims failed because defendant failed to establish prejudice stemming from trial counsel's alleged deficient performance.

¶ 28        In March 2024, an amended postconviction petition was filed by postconviction counsel, Byron Sloan. (The record does not indicate when Sloan replaced Hanson as defendant's postconviction counsel.) The amended postconviction petition adopted the entirety of the second amended postconviction petition filed by Lutz in June 2018 and the supplemental petition filed by Hanson in January 2023. It also added the following additional allegation: "[defendant] did not receive a fair trial, nor effective assistance of trial counsel, direct appeal counsel and reasonable assistance of post-conviction counsel, due to an erroneous series of related rulings by the trial court during *voir dire*." According to the amended petition, on the second day of jury selection,

"the trial court implicitly barred the jury from mention of, and also implicitly barred counsel from questioning jurors about the content of any media reports that each individual jurors had been exposed to, while knowing *** that potential jurors who had viewed those reports certainly knew that Defendant had previously pled guilty to the case being tried.

*** By trial counsel's acquiescing to the trial court's directives regarding the jurors not being allowed to disclose the contents of any media content, he neglected his ethical duty and breached professional standards, as he could not properly select a fair and impartial jury while intentionally depriving himself (and Defendant) of knowledge that would be fatal to a particular juror's service."

¶ 29　　The State filed a motion to dismiss the amended postconviction petition, contending: (1) defendant forfeited his claims that the trial court and trial counsel "mishandled *voir dire* concerning exposure to pretrial publicity" by failing to raise them on direct appeal and appellate counsel was not ineffective for failing to raise these issues on direct appeal because those issues were not meritorious and (2) defendant's claims that trial counsel was ineffective for failing to effectively present the motions for change of venue and a new trial failed on the merits because trial counsel did not perform deficiently and, even if trial counsel had performed deficiently, defendant failed to demonstrate prejudice.

¶ 30　　The trial court held a hearing on the State's motion to dismiss in September 2024. On October 18, 2024, the court entered a written order granting the State's motion. The court found (1) defendant forfeited his claims regarding the court's and trial counsel's conduct during *voir dire* by failing to raise them on direct appeal and appellate counsel was not ineffective for failing to raise the claims on direct appeal because they were nonmeritorious and (2) defendant failed to

- 14 -

make a substantial showing of a constitutional violation with respect to his claim of ineffective assistance of counsel related to the motion for a change of venue because (a) trial counsel's performance was not deficient and (b) even if trial counsel had performed deficiently, defendant failed to demonstrate he was prejudiced.

¶ 31        This appeal followed.

¶ 32                              II. ANALYSIS

¶ 33        On appeal, defendant contends the trial court erred in dismissing his amended petition because "[t]he trial court and [trial] counsel deprived [him] of a fair jury trial by failing to question potential jurors about the substance of their knowledge about [his] case learned from local media reports." Defendant raises this contention as a single claim—appellate counsel was ineffective for failing to raise two claims: (1) the court abused its discretion and (2) trial counsel provided ineffective assistance of counsel. We will address those contentions as two separate arguments. Additionally, we note defendant does not provide any argument regarding the claim in his amended postconviction petition that trial counsel was ineffective for failing to adequately present the motion for a change of venue. Therefore, we will not address that claim. See Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) (points not raised on appeal are forfeited.)

¶ 34          A. Motion to Take Judicial Notice of Agreed Statement of Facts

¶ 35        At the outset, we note defendant filed a motion requesting this court take judicial notice of an agreed statement of facts filed in appeal No. 2-18-0821. The agreed statement of facts relates to a hearing (which was not transcribed) on defendant's motion to reconsider the trial court's order on August 20, 2018, dismissing defendant's second amended postconviction petition. We deny defendant's motion solely because the agreed statement of facts was not necessary to the resolution of the issues raised here on appeal.

¶ 36                                    B. Postconviction Proceedings

¶ 37          The Act "provides a mechanism by which a criminal defendant can assert his conviction and sentence were the result of a substantial denial of his rights under the United States Constitution, the Illinois Constitution, or both." *People v. English*, 2013 IL 112890, ¶ 21. Proceedings under the Act have three stages. *People v. Allen*, 2015 IL 113135, ¶ 21.

¶ 38          "At the first stage, the circuit court must review the petition within 90 days of its filing and determine whether the petition states the gist of a constitutional violation." *People v. Bailey*, 2017 IL 121450, ¶ 18. "The allegations of the petition, taken as true and liberally construed, need only present the gist of a constitutional claim." *People v. Brown*, 236 Ill. 2d 175, 184 (2010). A postconviction petition advances to the second stage of postconviction proceedings if (1) the court fails to rule on the petition within the 90-day period, regardless of the petition's merit (*People v. Harris*, 224 Ill. 2d 115, 129 (2007)) or (2) the facts alleged in the petition state an arguable claim of a constitutional deprivation (*People v. Hodges*, 234 Ill. 2d 1, 9 (2009)).

¶ 39          Once the court has docketed a postconviction petition for second-stage proceedings, the State "shall answer or move to dismiss." 725 ILCS 5/122-5 (West 2024). Additionally, the court may appoint counsel to represent the defendant. *Id.* § 122-4; *People v. Edwards*, 197 Ill. 2d 239, 245 (2001). The relevant inquiry at the second stage is "whether the allegations in the petition, liberally construed in favor of the [defendant] and taken as true, are sufficient to invoke relief under the Act." *People v. Sanders*, 2016 IL 118123, ¶ 31. The defendant bears the burden of making such a showing. *People v. Domagala*, 2013 IL 113688, ¶ 35.

¶ 40          This court reviews the dismissal of a postconviction petition at the second stage *de novo*. *Sanders*, 2016 IL 118123, ¶ 31.

¶ 41                                    C. Forfeiture

- 16 -

¶ 42    The doctrine of *res judicata* bars courts from considering claims in a postconviction petition raised and decided on direct appeal. *People v. Pitsonbarger*, 205 Ill. 2d 444, 456 (2002). Issues a defendant could have, but failed to, raise on direct appeal are considered forfeited and may not be raised in a postconviction petition. *Id.*

¶ 43    In this case, defendant concedes his claims were not raised on direct appeal. However, he asserts this court should excuse any forfeiture because appellate counsel was ineffective for failing to raise the issues on direct appeal.

¶ 44    D. Ineffective Assistance of Appellate Counsel

¶ 45    "[T]he doctrines of *res judicata* and forfeiture are relaxed where fundamental fairness so requires, where the forfeiture stems from the ineffective assistance of appellate counsel, or where the facts relating to the issue do not appear on the face of the original appellate record." *English*, 2013 IL 112890, ¶ 22.

¶ 46    To establish ineffective assistance of appellate counsel, "a defendant must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *Id.* ¶ 33. Our supreme court has held "[a]ppellate counsel is not required to brief every conceivable issue on appeal *** and it is not incompetence for counsel to refrain from raising issues that counsel believes are without merit." *People v. Edwards*, 195 Ill. 2d 142, 163-64 (2001). Moreover, a defendant cannot establish prejudice from appellate counsel's failure to raise a nonmeritorious issue. See *People v. Enis*, 194 Ill. 2d 361, 382 (2000). "Appellate counsel's assessment of the merits of an issue *** depends on the state of the law at the time of the direct appeal." *English*, 2013 IL 112890, ¶ 34.

¶ 47    Consequently, we must evaluate defendant's contentions regarding the trial court's and trial counsel's conduct during *voir dire* to determine whether "there is a reasonable probability

that [his] appeal would have been successful" if appellate counsel had raised those contentions on direct appeal. *Id.* at ¶ 33.

¶ 48   "The conduct and scope of *voir dire* is within the discretion of the trial court." *People v. Cloutier*, 156 Ill. 2d 483, 495 (1993). "[O]nly when the court's actions have frustrated the purpose of *voir dire* will an abuse of discretion be found." *Id.* at 496. The purpose of *voir dire* is to " 'ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath.' " *People v. Buss*, 187 Ill. 2d 144, 176 (1999) (quoting *Cloutier*, 156 Ill. 2d at 496).

¶ 49   In this case, defendant argues the trial court frustrated the purpose of *voir dire* by not questioning potential jurors in depth regarding their knowledge of pretrial publicity surrounding defendant's case, specifically, defendant's prior guilty plea in the middle of his initial trial, and implicitly preventing the State and trial counsel from doing the same. Consequently, according to defendant, he was denied a fair trial because multiple jurors selected to serve on defendant's jury were presumptively biased because they had knowledge of pretrial publicity surrounding defendant's case. We disagree.

¶ 50   At the time of defendant's initial appeal, both our supreme court and the Supreme Court of the United States had determined that the trial court is not required to ask content-based questions of potential jurors regarding their knowledge of pretrial publicity surrounding a defendant's case. See *People v. Kirchner*, 194 Ill. 2d 502, 532 (2000); *Mu'Min v. Virginia*, 500 U.S. 415, 425 (1991). In *Kirchner*, 194 Ill. 2d at 524, a potential juror revealed during jury selection "that he had read about defendant's case in a newspaper that was in the jury assembly room, where prospective jurors waited to be called for *voir dire*."

"That article had the headline, 'Jury selection begins in triple slaying,' and a picture of defendant in handcuffs and an orange jumpsuit. The article described, *inter alia*, the 'general feeling of unease' and fears of Douglas County residents as a result of the murders, the victims' employment histories and their good characters, the victims' survivors, the impact of the murders on Bonnie Brewer's coworkers, defendant's criminal record, and the State's assertion at a bond hearing that defendant had a ' "great motivation" ' to flee. The article also contained information Warner had given police, such as the fact that defendant had come to Warner's house with blood on his clothing and a bloody knife with a broken tip." *Id.* at 525.

After this revelation by the potential juror, the trial court asked potential jurors whether they had heard or read anything about the case, and if so, whether they could put aside their prior knowledge and decide the case solely on the evidence presented at trial. *Id.* Although the trial court inquired about whether the potential jurors were exposed to pretrial publicity, the trial court did not ask any questions about what information the potential jurors had been exposed to based on pretrial publicity. *Id.* Following his conviction, the defendant appealed, alleging "the circuit court's failure to ask jurors precisely what they had read and recalled about the case precludes a determination that his jury was impartial." *Id.* at 531. Our supreme court disagreed and held, "[T]he circuit court was not required to ask jurors to detail their recollection of media coverage of defendant's case. The *voir dire* in this case was sufficient to determine whether jurors could decide defendant's case based on the evidence presented in court." *Id.* at 532.

¶ 51        Similarly, in *Mu'Min*, 500 U.S. at 418, defense counsel filed a motion for change of venue with 47 articles attached relating to facts of the murder for which the defendant was

charged. Those newspaper articles specifically included mentions of the defendant's prior criminal history, the fact he was serving a sentence for another murder when he escaped from work release, and information about the defendant's confessions. *Id.* In *Mu'Min*, the trial court asked the following questions of potential jurors:

" 'Would the information that you heard, received, or read from whatever source, would that information affect your impartiality in this case?'

'Is there anyone that would say what you've read, seen, heard, or whatever information you may have acquired from whatever the source would affect your impartiality so that you could not be impartial?'

\*\*\*

'Considering what the ladies and gentlemen who have answered in the affirmative have heard or read about this case, do you believe that you can enter the Jury box with an open mind and await until the entire case is presented before reaching a fixed opinion or conclusion as to the guilt or innocence of the accused?'

\*\*\*

'...In view of everything that you've seen, heard, or read, or any information from whatever source that you've acquired about this case, is there anyone who believes that you could not become a Juror, enter the Jury box with an open mind and wait until the entire case is presented before reaching a fixed opinion or a conclusion as to the guilt or innocence of the accused?' " *Id.* at 420.

The trial court did not delve into the specific content of the pretrial publicity the potential jurors identified. *Id.* at 419. The defendant was convicted, and on appeal, he argued "he was entitled to a new trial as a result of the judge's failure to permit the proposed *voir dire* questions." *Id.* at 421.

The United States Supreme Court disagreed, holding,

> "Whether a trial court decides to put questions about the content of publicity to a potential juror or not, it must make the same decision at the end of the questioning: is this juror to be believed when he says he has not formed an opinion about the case? Questions about the content of the publicity to which jurors have been exposed might be helpful in assessing whether a juror is impartial. To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Id.* at 425-26.

¶ 52 We also find Justice O'Connor's concurrence in *Mu'Min* particularly insightful. In her concurrence she noted,

> "Nor is the question whether jurors who read that [the defendant] had confessed to the murder should have been disqualified as a matter of law. [Citation.] This claim is squarely foreclosed by *Patton v. Yount*, 467 U.S. 1025 *** (1984), where we upheld a trial court's decision to seat jurors who had read about the case notwithstanding that the defendant's written confessions, which were not admissible at trial, were widely reported in the press. [Citations.] The only question before us is whether the trial court erred by crediting the assurances of eight jurors that they could put aside what they had read or heard and render a fair verdict based on the evidence." *Id.* at 432 (O'Connor, J., concurring).

While *Mu'Min* involved media coverage of a confession, under the circumstances, we discern no distinction between a potential juror's knowledge of a defendant's prior guilty plea and knowledge of a defendant's prior confession. While we acknowledge a confession and a guilty plea are legally

distinct, from a layperson's perspective, *i.e.*, a potential juror's, a confession is the functional equivalent of a plea of guilty. Both involve a defendant accepting responsibility for, or confessing to, the crime and admitting his guilt. As explained by Justice O'Conner in her concurrence, the Supreme Court's decision in *Patton* makes it clear that a potential juror is not automatically barred from serving on a jury, even if the juror has prior knowledge of a defendant's confession.

¶ 53       In this case, the trial court's questioning of potential jurors during *voir dire* was strikingly similar to the methods used by the courts in *Mu'Min* and *Kirchner*. The court inquired whether potential jurors had been subjected to any pretrial publicity, and if so, whether those potential jurors could put aside their prior knowledge and decide the case solely on the evidence presented at trial. Any potential jurors who stated they could not put the information aside or even expressed hesitation about whether they could put the information aside were removed by the court for cause. Defendant acknowledges the court's procedure for conducting *voir dire* in this case was akin to the procedures employed in *Mu'Min* and *Kirchner*, but asserts the court should have nevertheless inquired further about pretrial publicity because the pretrial publicity in defendant's case was of the type that was so highly prejudicial that "the judge ha[d] no choice but to inquire as to the details which the potential juror remember[ed]." *People v. Taylor*, 101 Ill. 2d 377, 394 (1984).

¶ 54       In *Taylor*, a juvenile was convicted of felony murder and armed robbery. *Id.* at 380.

          "Media coverage of th[e] case in Peoria and the surrounding communities was unprecedented. *** Detailed coverage began on the day of the crime, and the progress of the police investigation, the juvenile court proceedings, the hearing, *voir dire*, and trial in the adult division were all fully and closely reported." *Id.* at 383.

Moreover, multiple newspaper articles published prior to the defendant's trial referenced the fact that the defendant took a polygraph test and " 'did not pass.' " *Id.* at 383-84. During jury selection, "many of the defendant's challenges for cause based on prospective jurors' knowledge of inadmissible and highly prejudicial details of the investigation were denied, as w[as] a defense motion for additional peremptory challenges due to the extensive public knowledge of the case." *Id.* at 383. The defendant was ultimately convicted, and on appeal, he argued he was "denied a fair trial because jurors had actual knowledge of inadmissible material prior to selection on this panel." *Id.* at 386. Our supreme court agreed, finding:

> "Once the judge is aware that there has been intensive publicity which included dissemination of inadmissible and highly prejudicial information, the judge has no choice but to inquire as to the details which the potential juror remembers. As soon as the juror mentions these details, that juror is subject to a challenge for cause. Any further questions serve only to highlight the information and to increase the likelihood that any inferences, once drawn, will now be remembered, and any inferences not yet drawn, will now be drawn. There is no alternative but to excuse the potential juror." *Id.* at 394.

¶ 55 Although we acknowledge our supreme court's decision in *Taylor*, we find defendant's case distinguishable. Admittedly this case and *Taylor* are similar, as both cases involved pretrial publicity that included information which was prejudicial and inadmissible at trial. However, despite this similarity, there are two distinct differences. The first is the volume of the pretrial publicity and the extent to which the jurors had any prior knowledge of the case. In *Taylor*, our supreme court noted, "The record of the *voir dire* as a whole indicates widespread awareness of this case. There were almost no prospective jurors who knew nothing of the case.

Even individuals who initially stated that they remembered very little responded to further questions by providing details." *Id.* at 387. In contrast, out of the 12 jurors selected to serve on defendant's jury in this case, 7 had not heard anything about the case. Moreover, there were only three newspaper articles published prior to jury selection. This is a far cry from the "unprecedented" publicity surrounding the trial in *Taylor*. *Id.* at 383. We find the lack of pervasive pretrial publicity in this case fatal to defendant's argument regarding the trial court's procedures during *voir dire*. Our supreme court noted, in *Taylor*, "What we have in this case is the documented fact of the unprecedented volume of publicity *combined with* the exposure of impaneled jurors to inadmissible, highly prejudicial information pertaining to the release of the codefendant because of his performance on a lie detector test." (Emphasis added.) *Id.* at 395. In this case, we find there was a lack of pervasive pretrial publicity, as evidenced by the number of articles published at the time of defendant's retrial, the length of jury selection, and the number of jurors who had no knowledge of defendant's case.

¶ 56       Second, this case is distinguishable from *Taylor* because of the nature of the prejudicial information. As our supreme court explained,

> "Lie detector tests are inadmissible in Illinois to prove either guilt or innocence. [Citation.] The reason is twofold. On the one hand, the results of polygraph examinations are not sufficiently reliable to be used to prove guilt or innocence. On the other hand, because of their quasi-scientific appearance, the results of polygraph examinations are likely to be given undue weight in the minds of jurors. The possibilities for prejudice are obvious; jurors will assume that the polygraph is reliable. Jurors do not have the experience or the technical skill to understand that a reported 'failure' might in fact be a 'pass' or vice versa, much

- 24 -

less that 'inconclusive' is not another word for 'failure.'

Even under the controlled and standardized conditions of courtroom procedure, the danger is too great that jurors will not understand the disclaimers, will be unprepared to evaluate the conflicting testimony of experts, will not be able to heed the admonitions of the trial judge, and will, in the end, overemphasize the polygraph results." *Id.* at 391-92.

The disclosure of lie detector results is highly prejudicial because it gives a juror an unreasonable belief that there is a scientific method to ascertain whether a defendant is lying, and consequently, there is a scientific procedure to ascertain the defendant's guilt. As the *Taylor* court aptly stated, "information about polygraphs, by its nature, is unlike other factual details. This is not the type of information which the average juror can easily ignore. Its effect is subtle and unconscious, but at the same time potent." *Id.* at 393. Conversely, there is no such scientific method present in the instant case. Even if we assume, as the trial court did here, that the jurors who indicated they were aware of the media coverage of the case also had knowledge of defendant's guilty plea, how is this any different than a potential juror having knowledge of a defendant's inadmissible confession, as the jurors did in *Patton*, 467 U.S. at 1029? Accordingly, we cannot conclude that a juror's mere knowledge of a prior guilty plea is an automatic bar to serving as a juror. Consequently, this information was not so highly prejudicial that any potential lack of impartiality or prejudice could not be ascertained based upon the inquiry the trial court conducted.

¶ 57        Accordingly, for the foregoing reasons, we cannot conclude the trial court abused its discretion by not asking content-based questions about pretrial publicity during *voir dire*.

¶ 58                    E. Ineffective Assistance of Trial Counsel

¶ 59        In addition to arguing the trial court abused its discretion by not asking

content-based questions about pretrial publicity during *voir dire*, defendant contends trial counsel was ineffective for failing to delve into the potential jurors' knowledge of pretrial publicity.

¶ 60    A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14 (quoting *Strickland*, 466 U.S. at 688). " 'Further, in order to establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy.' " *People v. Manning*, 241 Ill. 2d 319, 327 (2011) (quoting *People v. Smith*, 195 Ill. 2d 179, 188 (2000)). " 'Matters of trial strategy are generally immune from claims of ineffective assistance of counsel.' " *Id.* (quoting *Smith*, 195 Ill. 2d at 188). Prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004). A defendant must satisfy both prongs of the *Strickland* standard, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18 (2010).

¶ 61    In this case, we cannot find trial counsel performed deficiently. Although trial counsel did not ask any content-based questions about the potential jurors' exposure to pretrial publicity, the trial court extensively questioned the jurors who had been exposed to pretrial publicity about whether they could put their existing knowledge aside and be fair and impartial. Additionally, even if we presume, as defendant asserts, that the court implicitly prevented trial

counsel from asking content-based questions about the potential jurors' exposure to pretrial publicity, trial counsel's failure to object to this procedure did not constitute deficient performance. As discussed above, a potential juror's knowledge about defendant's prior guilty plea does not create an automatic bar from that juror serving on the jury. Therefore, trial counsel did not perform deficiently by failing to object to any implicit bar from asking content-based questions. Trial counsel ensured all jurors seated to hear defendant's trial could be fair and impartial, regardless of their exposure to pretrial publicity. Consequently, we conclude trial counsel did not perform deficiently during jury selection.

¶ 62                            III. CONCLUSION

¶ 63          For the reasons stated, we affirm the trial court's judgment.

¶ 64          Affirmed.